In re Tanvir ALVI, Debtor.

AT & T UNIVERSAL CARD
SERVICES, Plaintiff,

v.

Tanvir ALVI, Defendant.

FCC NATIONAL BANK, Plaintiff,

v.

Tanvir ALVI, Defendant.

Bankruptcy Nos. 95 B 3378,
95 A 505 and 95 A 365.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 10, 1996.

Lawrence Friedman, Chicago, IL, for AT & T Universal Card Services and FCC Nat. Bank.

Edward Joseph Varga, Ruddy & Varga, Aurora, IL, for Tanvir Alvi.

Roy Safanda, Trustee, St. Charles, IL.

## MEMORANDUM OPINION AND ORDER

ROBERT E. GINSBERG, Bankruptcy Judge.

This matter is before the Court on the complaints of two creditors to determine whether certain credit card debts incurred by the Debtor, Tanvir Alvi, are nondis-

chargeable under 11 U.S.C. § 523(a)(2)(A).[1] The Plaintiffs presented their cases in full at a trial held December 7, 1995. After the Plaintiffs rested and before presenting his case in chief, the Debtor moved for a judgment on partial findings pursuant to Fed. R.Civ.P. 52. It is that motion which is now before the Court for determination.

The basis for the instant dischargeability proceedings is not unique. Credit card issuers routinely file adversary proceedings against individual debtors in bankruptcy cases seeking a determination that a debtor's obligations to the credit card lenders are nondischargeable due to alleged fraudulent conduct in using the credit cards. Such is the case here. After considering the legal standards now applicable to the determination of the dischargeability of credit card debt, the Court now finds: 1) Creditors who bring section 523(a)(2)(A) actions in consumer bankruptcy cases must prove that they "justifiably relied" on representations of a debtor when they extended credit; 2) the use of a credit card, in itself, does not constitute a representation or statement which is capable of being true or false; 3) Creditors must prove that a debtor had the requisite scienter. In this case, the Plaintiffs have failed to meet their burdens of proof on all elements. The Court makes a judgment on partial findings that the debts owed by the Debtor to the Plaintiffs at issue in these adversary proceedings are dischargeable in this Chapter 7 case.

### Jurisdiction and Procedure

The Court has jurisdiction over these matters under 28 U.S.C. § 1334(b) as matters arising under section 523(a)(2)(A) of the Bankruptcy Code. These matters are core proceedings under 28 U.S.C. § 157(b)(2)(I) relating to the dischargeability of debts. These matters are before the Court pursuant to Local Rule 2.33 of the United States District Court for the Northern District of Illi-

1. § 523. Exceptions to discharge.

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

nois automatically referring bankruptcy cases and proceedings to this Court for hearing and determination.[2]

### Standard for Judgment on Partial Findings

Federal Rule of Civil Procedure 52(c),[3] made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052, provides that the Court can enter a judgment as a matter of law at any time that the Court appropriately can make a dispositive finding. If a party has been heard fully on an issue and failed to sustain its burden of proof on that issue, the Court may find against that party on that issue, and, assuming the issue is necessary to the maintenance of the cause of action, the Court can enter judgment against that party. In making this determination, the Court should "weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1475 (7th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993), *citing Sanders v. General Serv. Admin.*, 707 F.2d 969, 971 (7th Cir.1983). If the Court denies a defendant's motion for judgment on partial findings and declines to render a judgment until the close of all of the evidence, the presentation of the case will continue. It is within the discretion of the bankruptcy court, as the trial court, to decline to render a judgment until the Court has heard all of the evidence. *Internat'l Union of Operating Engineers, Local Union 103 v. Indiana Construction Corp.*, 13 F.3d 253 (7th Cir.1994).

### Findings of Fact

The parties do not dispute the material facts. These proceedings involve two credit cards, one issued by AT & T Universal Card Services and one issued by FCC National Bank. The Debtor had credit limits of $7,500 on his AT & T credit card and $3,500 on his FCC credit card.

After paying the $1,088.18 balance on his AT & T credit card in full, the Debtor used the AT & T credit card between August 22, 1994 and October 24, 1994 to obtain cash advances at the Hollywood Casino in Aurora, Illinois, accruing $7,956.90 in debt for advances and related fees. He made one payment of $130 to AT & T on September 26, 1994.[4]

After paying the $1,259.98 balance on his FCC credit card in full, from October 26, 1994 through October 31, 1994 the Debtor used the FCC credit card to obtain cash advances at the Hollywood Casino in Aurora, Illinois, incurring a total of $3,776.64 in cash advances and fees.

The Debtor marginally exceeded the available limits on both credit cards. AT & T reminded the Debtor on his November 13, 1994 statement that his "minimum payment includes over limit and past due amounts" and requested immediate payment. (Plaintiff's exhibit E). While the Debtor did not remit an immediate payment as AT & T demanded, he made no further charges on his AT & T card.

The Debtor's FCC statement for the month of October, 1994 contained the following warning: "as of this date, the balance on your account is $291.94 over your credit limit. Please refrain from further use of your account until $384.94 has been paid." (Plaintiff's Exhibit H). The Debtor did not pay FCC, nor did he make any additional charges on his FCC credit card. FCC's bill dated

---

**2.** Since these adversary proceedings involve the same Debtor, arise in the same bankruptcy case, and one lawyer represents both plaintiffs, the parties agreed to have both adversaries heard together.

**3.** Rule 52. Findings by the Court; Judgment on Partial Findings.

(c) Judgment on Partial Findings. If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

**4.** Prior to the time period in question, the Debtor made significant payments to his creditors from his gambling winnings. Transcript, p. 12.; Plaintiff's Exhibit B.

January 3, 1995 stated: "This is a reminder that, as of December 3, 1994, the balance on this account is over your credit limit and past due. Because of this, your purchases and cash advances may be declined." (Plaintiff's exhibit J).

On February 21, 1995, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code, listing a total of $54,202.19 in unsecured debt. It is undisputed that at least 75% of this amount was taken in the form of cash advances at casinos.

While the Debtor's gambling losses certainly were a major contributing factor to his financial problems, they were not the only source of his economic woes. The Debtor had been employed as a security officer at Central DuPage Hospital since December of 1990. He earned approximately $1,000 per month in gross wages. Transcript, p. 23. However, the Debtor was laid off from his job on September 3, 1994. Despite the layoff, the hospital continued to pay him for the next two months. The Debtor believed that he would be placed in a new position at the hospital after a paid layoff period which would last no longer than two months. He testified that he understood this to be the standard practice at the hospital. Transcript, p. 17. Unfortunately, his understanding was incorrect. He was not rehired by Central DuPage Hospital during his two month "layoff." As soon as he was aware that he would not be returning to work as he expected, he also stopped gambling.[5]

In December of 1994, the Debtor obtained a part time security officer position with Glen Oaks Hospital, but he still was unable to secure full-time employment. The Debtor filed a Chapter 7 petition in February of 1995. The Debtor attributed his bankruptcy to the delay in his expected reinstatement at Central DuPage Hospital. In March of 1995, J.C. Penney hired the Debtor as a full-time security guard. On May 5, 1995, Central DuPage Hospital rehired the Debtor as a van delivery driver at the same salary he had received as a security guard prior to his layoff.

*Conclusions of Law*

■ The policies underlying the Bankruptcy Code require that exceptions to discharge be strictly construed against creditors and in favor of a fresh start for debtors. *See Goldberg v. Scarlata,* 979 F.2d 521 (7th Cir. 1992); *In the Matter of Paeplow,* 972 F.2d 730 (7th Cir.1992). The discharge is an essential feature to this notion of a "fresh start." *In the Matter of Marchiando,* 13 F.3d 1111, 1115 (7th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994). In order to prevail, AT & T and FCC in their cases in chief must have established by a fair preponderance of the evidence all of the requirements of section 523(a)(2)(A). *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Section 523(a)(2)(A) provides that a Chapter 7 discharge will not discharge the Debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and false representation. However, like most other Circuit Courts of Appeals, the Seventh Circuit requires this Court to apply a single test to actions alleging actual fraud, false representation and false pretenses even though the elements of each were different under common law. *See Mayer v. Spanel Internat'l Ltd.,* 51 F.3d 670, 674 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *see also Banner Oil Co v. Bryson,* 187 B.R. 939 (Bankr.N.D.Ill.1995). In the early days of the Bankruptcy Code, *First Nat'l Bank of Red Bud v. Kimzey,* 761 F.2d 421 (7th Cir. 1985) originally provided the basis for the Seventh Circuit's single section 523(a)(2)(A) test:

First, the creditor must prove that the debtor obtained the money through repre-

---

5. The Debtor testified that he stopped gambling in mid–November when he received no call from Central DuPage Hospital as he had expected. Transcript, p. 10.

sentations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979). The creditor also must prove that the debtor possessed scienter, i.e., an intent to deceive. *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir. 1984). Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable. *Carini*, 592 F.2d at 381.

*Kimzey*, 761 F.2d at 423–24.[6]

██ While both the Seventh Circuit and the Supreme Court recently have altered at least one of the elements of this test,[7] the Seventh Circuit declined to invalidate the test as a whole or establish three separate tests for actions brought under one or more of the three types of fraudulent acts specified in section 523(a)(2)(A). *Mayer*, 51 F.3d at 674.[8] Therefore, this Court must apply the same test to all actions brought under section 523(a)(2)(A), regardless of whether a creditor alleges "false pretenses," "false representation," or "actual fraud."

The Debtor brought his motion for a judgment on partial findings based on the theory that the Plaintiffs failed to prove that they justifiably relied on representations of the

Debtor, as is required by the Supreme Court's recent decision in *Field v. Mans*. *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995). The Plaintiffs contend that the crux of this matter is not reliance, but rather "whether the debtor had a reasonable belief of his intent and ability to repay" the credit card debts. Plaintiff's Findings of Fact and Conclusions of Law, p. 5; Transcript p. 30.

*Did the Creditors Act with Justifiable Reliance?:*

██ Recently, the United States Supreme Court held that the correct standard for measuring reliance for purposes of section 523(a)(2)(A) is "justifiable reliance," at least when determining whether a debtor engaged in "actual fraud." *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).[9] Thus, *Field* requires that for a debt to be nondischargeable under section 523(a)(2)(A), the Creditors must have, in fact, relied on the Debtor's actual representation, and that the Creditors' reliance must have been "justifiable." *Id.*, at 11. The Plaintiffs contend that the facts of the instant proceedings are very different from the facts of *Field*, and therefore *Field* is not controlling. The facts of the instant proceedings certainly differ from the facts of *Field*.[10] Yet, nothing in the

6. As in other circuits, the Seventh Circuit in *Kimzey* focused on a common law definition of "fraud," a word that appears in section 523(a)(2)(A) as part of the phrase "actual fraud." In so doing, the *Kimzey* court relied on cases decided under the former Bankruptcy Act of 1898.

7. *See* discussion of reliance, *infra* p. 8.

8. In *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court spoke specifically of the elements of actual fraud at least partly because "the district court treated Man's conduct as amounting to fraud." *Id.*, at ——, 116 S.Ct. at 444. The Supreme Court also emphasizes that Congress intended to deny discharge only to debtors who acted with the requisite scienter. *Id.*, at ——, 116 S.Ct. at 442. The scienter requirement is the primary distinction between actual fraud and the other two underlying causes of action in section 523(a)(2)(A). One could conclude that the Supreme Court endorses the use of a single test for actual fraud, false representation and false pretenses. *See* Conclusions of Law, *infra.*, p. 10.

9. Even prior to the Supreme Court's ruling, the Seventh Circuit appeared to change its analysis

of the reliance requirement in *Mayer v. Spanel Internat'l Ltd.*, 51 F.3d 670 (7th Cir.1995). The Seventh Circuit in *Mayer* could not discern a sound basis in law or policy which justified a requirement of "reasonable" reliance" on the part of the creditor. Because this section of the Bankruptcy Code reflects the Congressional intent that "the honest but unfortunate debtor" should get a fresh start," *id.*, at 674, *quoting Grogan*, 498 U.S. at 286–87, 111 S.Ct. at 659–60, a reasonableness component is inconsistent with common law fraud and tort law which do not require victims to take objectively acceptable precautions to protect their rights. Therefore, *Mayer* called for a lower standard of proof on the reliance element; a creditor did not have to prove his reliance was objectively reasonable. Rather, reliance simply was a "conjunction of a material misrepresentation with a causation in fact." *Mayer*, 51 F.3d at 676.

10. In *Field*, the plaintiffs, the Fields, sold real estate to a corporation controlled by one Mans. Mans provided more than half of the purchase price in cash, and personally guaranteed a promissory note for $187,500 secured by a second mortgage on the property. The mortgage deed

*Field* analysis suggests that the standard it established was limited to the particular fact pattern before the Supreme Court. There is no suggestion in Justice Souter's majority opinion that the facts of *Field* made it *uniquely* entitled to a "justifiable reliance" analysis. Rather, the Court's analysis focuses almost exclusively on what the drafters of the 1978 Bankruptcy Code had in mind for section 523(a)(2)(A) as a general matter. Because the Supreme Court vacated the First Circuit judgment and remanded, the Supreme Court never even applied the test to the particular facts of *Field.* The most logical interpretation of the Supreme Court's holding is that "justifiable reliance" is an element of all "fraud" actions brought by creditors under section 523(a)(2)(A). *See P & S X–Ray Co., Inc. v. Dawes,* 189 B.R. 714 (Bankr.N.D.Ill.1995) (applying *Field* justifiable reliance standard). Moreover, as was discussed previously, bankruptcy courts in the Seventh Circuit must apply a single action test to all proceedings under section 523(a)(2)(A), whether the allegation is fraud, false pretenses, or false representation. *Mayer,* 51 F.3d at 674. Thus, "justifiable reliance" is an element of all 523(a)(2)(A) actions to be proved by all plaintiffs in section 523(a)(2)(A) proceedings, regardless of the theory of the case. *See Irwin v. O'Bryan,* 190 B.R. 290 (Bankr.E.D.Ky.1995) (applying *Field* justifiable reliance standard

to section 523(a)(2)(A) action alleging fraudulent misrepresentation); *Stone v. Parriman,* 190 B.R. 88 (Bankr.E.D.Ky.1995); *Bombardier Capital, Inc. v. Baietti,* 189 B.R. 549 (Bankr.D.Me.1995) (stating that *Field* standard applies to all actions under section 523(a)(2)(A)). AT & T and FCC must prove not only actual reliance, but that their reliance was "justifiable" under the circumstances.

 "Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case ... Justifiability is not without some limits, however ... a person is required to use his sense and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field,* —— U.S. at ——, 116 S.Ct. at 444, *citing* Restatement (Second) of Torts (1976), comments a, b. "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Id., citing* W. Prosser, Law of Torts § 108 (5th Ed.1984).[11] Of course, before embarking on

required that the purchaser, Mans' corporation, obtain the consent of the Fields before conveying the encumbered real estate during the term of the secured indebtedness. In the event of an unauthorized conveyance, the entire unpaid balance on the note would be due and payable.

Mans' corporation conveyed the property to a newly formed partnership without the Fields' consent. One day later, Mans wrote to the Fields asking them to waive their rights under the due-on-sale clause. He claimed to be concerned about triggering the clause if he added a new principal to his land development organization, and did not mention that the property had been conveyed. The Fields replied in writing, agreeing to waive the clause for $10,500. Mans counter-offered for $500, again making no mention of the transaction which had already taken place. The Fields did not respond.

Three years later, Mans filed a petition for relief under Chapter 11 of the Bankruptcy Code. Several months thereafter, the Fields learned of the past unauthorized conveyance after their lawyer searched the registry of deeds. The Fields filed an adversary proceeding, alleging

that the Debtor incurred an immediate obligation of approximately $150,000 as the personal guarantor when his corporation transferred the property without authorization, and that this obligation should be deemed nondischargeable under 11 U.S.C. § 523(a)(2)(A). Applying the reasonable reliance standard, the bankruptcy court found that "the Fields had unreasonably ignored further reason to investigate in 1988, when Mr. Field's boss told him of a third party claiming to be the owner of the property." *Field,* —— U.S. at ——, 116 S.Ct. at 440. The District Court affirmed on the basis that the Bankruptcy Court's finding was supported by adequate indication in the record that the Fields had relied upon the Debtor's misrepresentations without sufficient reason. Likewise, the Court of Appeals for the First Circuit affirmed. *Field v. Mans,* 36 F.3d 1089 (1st Cir.1994).

11. Likewise, as applied in other Circuit Courts of Appeals, the justifiable reliance test focuses on the subjective qualities of the creditor, which necessarily includes the creditor's level of sophistication and expertise. *See, e.g., Eugene*

an analysis of whether the creditor acted justifiably, the Court first must be sure that the Creditors proved they *actually* relied on representations of the Debtor.

■ AT & T and FCC did not prove by a preponderance of the evidence that they each actually and justifiably relied on any representations of the Debtor in making the cash advances at issue in this proceeding. In fact, the Plaintiffs offered virtually no evidence about their reliance on any misrepresentations by the Debtor. The Court cannot just assume the Plaintiffs in these proceedings actually relied on any alleged representation by the Debtor in doing business with him. Case law indicates that some credit card issuers choose not to prevent the use and abuse of their cards; instead, they have calculated the attendant risks and allow consumers relatively free reign with their cards and credit limits. "Banks are willing to risk non-payment of debts because that risk is factored into finance charges. Because the risk is voluntary and calculated, [523(a)(2)(A) ] should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits." *First Nat'l Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983). Creditors "might just as well pass out cards to every working person it can find and hope those who use them will pay for the charges." *In re Pressgrove*, 147 B.R. 244 (Bankr.D.Kan.1992) (finding debt to credit card issuers dischargeable).[12]

Passively extending credit hardly constitutes reliance on individual instances of card usage, nor can this Court conceive why such reliance, if it did exist, should always be justifiable. A creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation. Because AT & T and FCC failed to present any evidence indicating any reliance in fact on representations, the Court must grant the Debtor's motion for a judgment on partial findings.

*Even if the Creditors Had Demonstrated Reasonable Reliance, They Did Not Meet Their Burdens of Proof on the Other Elements*

While the Debtor brought his motion for a judgment on partial findings based only on the issue of justifiable reliance, the Court finds as a matter of law that the AT & T and FCC did not meet their burdens of proof on the other elements of a section 523(a)(2)(A) action, namely that the Debtor made representations and that the Debtor intended to deceive the Plaintiffs at the time he made those representations.

*Did the Debtor Make A Representation?*

■ The Creditors in this case presume that incurring a charge on a credit card is a representation. This Court does not agree that use of a credit card to incur debt necessarily involves a representation as a matter of fact or a matter of law. In fact, this Court believes the opposite is true. The use of a credit card to incur debt in a typical credit card transaction involves no representation, express or implied.

The United States Supreme Court has held that passing a bad check is not a "false statement" in the context of 18 U.S.C. § 1014[13] because the issuance of a check is

---

*Parks Law Corp. Defined Benefit Pension Plan v. Kirsh*, 973 F.2d 1454 (9th Cir.1992) (creditor had been business law attorney with sophisticated practice for twenty years and should have obtained title report, therefore did not justifiably rely on friend's representation regarding property); *accord, City Bank & Trust Co. v. Vann*, 67 F.3d 277 (11th Cir.1995) (establishing that justifiable reliance standard should apply to 523(a)(2)(A)).

**12.** As was discussed earlier in this opinion, in approaching the reliance requirement of section 523(a)(2)(A), the Supreme Court in *Field* instructed this Court to consider the qualities and characteristics of the particular plaintiff and the

circumstances of the particular case. *Field,* —— U.S. at ——, 116 S.Ct. at 444. The level of sophistication of large credit extending institutions cannot be ignored. Because AT & T and FCC did not go so far as to prove actual reliance, the Court need not belabor the level of justifiableness of their actions. Suffice it to say, the Creditors did not present sufficient evidence to support a finding of justifiableness.

**13.** 18 U.S.C. § 1014, "Loan and Credit Applications Generally; Renewals and Discounts; Crop Insurance," makes it a crime to make a false statement or report or willfully overvalue land, property, or security for the purpose of influencing the action of institutions whose deposits were

not an implied representation by the payor that there are sufficient funds in a checking account to cover the check. *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). "Technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.,* at 284, 102 S.Ct. at 3091. The Seventh Circuit has held that the *Williams* analysis applies in the context of section 523(a)(2)(A) of the Bankruptcy Code. *Goldberg Securities, Inc. v. Scarlata,* 979 F.2d 521 (7th Cir.1992); *accord In re Horwitz,* 100 B.R. 395 (Bankr.N.D.Ill.1989).

The similarities between the issuance of a check and the use of a credit card are sufficient to make it illogical to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a bad check does not, per se, involve a representation. Just as the Supreme Court has held a check is not capable of being true or false, using a credit card to incur debt in of itself is not capable of being true or false.[14]

The majority of courts that have analyzed section 523(a)(2)(A) have not considered the check cases and the Supreme Court's *Williams* opinion and instead have concluded that incurrence of debt via credit card is an implied representation. *See, e.g., In re Hin-*

*man,* 120 B.R. 1018 (Bankr.D.N.D.1990).[15] The Court declines to follow this line of cases, and holds that the use of a credit card in a credit transaction is not, per se, a representation.[16]

### Did The Debtor Intend To Deceive The Plaintiffs?

For the Debtor's debt to be nondischargeable under section 523(a)(2)(A), the Creditors must have shown not only that the Debtor obtained extensions of credit through false representations, but that the Debtor made those misrepresentations with "scienter." *In the Matter of Sheridan,* 57 F.3d 627 (7th Cir.1995); *Mayer v. Spanel Internat'l Ltd.,* 51 F.3d 670, 675 (7th Cir.1995).[17] The Supreme Court also held that a debt should be nondischargeable under section 523(a)(2)(A) only if the Debtor acted with scienter. *Field,* —— U.S. at ——, 116 S.Ct. at 443. Otherwise, debtors who made "unintentional and wholly immaterial misrepresentations having no effect on a creditor's decision" would have nondischargeable debts as a matter of course. *Id.* This obviously would have a negative impact on a debtor's opportunity for obtaining a fresh financial start through bankruptcy. Congress clearly did not intend to have the debtor emerge from bankruptcy saddled with a mountain of nondischargeable credit card debt incurred by a

insured by the Federal Deposit Insurance Corporation. In *Williams,* the government argued that checks in a check kiting scheme were "securities." *Williams,* 458 U.S. 279, 283, 102 S.Ct. 3088, 3090.

**14.** This is not to say that the use of a credit card can never be a representation comprising for purposes of a nondischargeability proceeding. For example, consider the following situation: a purchaser presents a credit card to a vendor whose machine to verify the validity of credit cards is out of order. The purchaser convinces the vendor to accept her credit card as a method of payment nonetheless, assuring the vendor that the credit card is good, when the purchaser knows at the time she makes the misrepresentation that she has exceeded her credit limit and her privileges have been revoked. Thereafter, the purchaser files for bankruptcy. The use of the credit card in this context would constitute a representation for the purposes of a proceeding under section 523(a)(2)(A).

**15.** This theory also has been criticized for paying too little heed to the fact that the plaintiff must

prove all elements of fraud, and also is somewhat inconsistent with the notion that exceptions to discharge are strictly construed against the creditor. *See Eashai v. Citibank, South Dakota, N.A.,* 167 B.R. 181 (9th Cir. BAP 1994).

**16.** The Court of Appeals for the Eleventh Circuit has adopted the "assumption of risk" theory, surmising that a credit card issuer assumes the risk that the cardholder may incur debts she cannot pay until the issuer revokes privileges, after which time the cardholder has made an intentional false representation if she uses the card. *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983). There is no evidence of such conduct in this proceeding. Indeed, the opposite is true. The Debtor did not use his AT & T and FCC cards after slightly surpassing his credit limit and being instructed by the issuers to refrain from use until he rectified the problem.

**17.** *Kimzey* suggested that reckless disregard of the truth is a form of intent to defraud. *See Mayer,* 51 F.3d at 674.

debtor with absolutely no intent to defraud the credit card lender.

It is difficult for a fact-finder to discern a debtor's state of mind at the time he incurred the debt regarding his intent to repay this debt in the future. Intent to repay usually must be established by circumstantial evidence. *See American Express Travel Related Services Co., Inc. v. Nahas,* 181 B.R. 930 (Bankr.S.D.Ind.1994). Therefore, courts sometimes look to the "totality of circumstances" to determine whether a debtor incurred the credit card debt with the requisite scienter. *In re Williams,* 85 B.R. 494 (Bankr.N.D.Ill.1988). This has prompted some courts to try to employ an objective formulaic approach to determine whether the debtor acted with the intent required by section 523(a)(2)(A). Factors which courts have considered in determining whether a debtor intended to repay include the following:

1. The length of time between charges made and bankruptcy filing. 2. Whether an attorney was consulted regarding bankruptcy before the charges were made. 3. The number of charges made. 4. The amount of the charges. 5. The debtor's financial condition when the charges were made. 6. Whether the charges exceeded the credit limit of the card. 7. Whether multiple charges were made on the same day. 8. Whether the debtor was employed. 9. The debtor's prospects for employment. 10. The debtor's financial sophistication. 11. Sudden changes in the debtor's buying habits. 12. Whether the purchases were for luxuries or necessities.

*In re Dougherty,* 84 B.R. 653, 657 (9th Cir. BAP 1988); *In re Faulk,* 69 B.R. 743 (Bankr. N.D.Ind.1986); *First Nat'l Bank of Lincolnshire v. Cloud,* 107 B.R. 156 (N.D.Ill.1989). By this approach, only "one or two of these factors alone could be sufficient to convince a court that an intent to deceive exists, particularly if the facts of the case are egregious." *FCC Nat'l Bank v. Berz,* 173 B.R. 159 (Bankr.N.D.Ill.1994). Other courts have used these factors to find "constructive fraud." *Strawbridge & Clothier v. Caivarelli,* 16 B.R. 369 (Bankr.E.D.Pa.1982); *Mercantile Trust Co. Nat'l Assoc. v. Pozucek,* 73 B.R. 110 (Bankr.N.D.Ill.1987). This approach basically equates the inability to pay with the lack of intent to pay. *See FCC Nat'l Bank et al. v. Bartlett,* 128 B.R. 775 (Bankr. W.D.Mo.1991), *citing In re Hinman,* 120 B.R. 1018 (Bankr.N.D.Ill.1990).[18]

■ This approach recently was called into question in the case of *Chase Manhattan Bank v. Murphy,* 190 B.R. 327 (Bankr. N.D.Ill.1995). This Court agrees with *Murphy* that the use of factors does not address the most important issue: the subjective intent of the defendant that is necessary for a finding of fraud. The presence or absence of certain factors may help determine the Debtor's objective ability to repay at the time of the credit card transaction. However, objective ability to pay at the time of the transaction is not the issue. The issue is the Debtor's subjective intent to repay the debt. Debtors can honestly, but mistakenly, believe that they have the ability to repay their debts. Since the analysis is subjective, i.e. did the Debtor intend to repay the credit card lender, the Court cannot require the Debtor to have a objectively reasonable basis for his belief:

Care must be taken to stop short of a rule that would make every desperate, financially strapped debtor a guarantor of his ability to repay, on pain of dischargeability. Such a rule would unduly expand the 'actual fraud' discharge exception by attenuating the intent requirement. A substantial number of bankruptcy debtors incur debts with hopes of repaying them that could be considered unrealistic in hindsight. This by itself does not constitute fraudulent conduct warranting non-discharge.

*Karelin v. Bank of America Nat'l Trust and Savings Assoc.,* 109 B.R. 943, 948 (Bankr. 9th

---

**18.** It seems rather incongruous to "impute to the debtor an ever-present ability to repay over the course of the revolving credit relationship—this is precisely the risk that any creditor assumes when issuing a line of credit." *Eashai v. Citi-*

Cir.1990).[19]

In the instant proceedings, the Debtor incurred a significant amount of unsecured credit card debt, mostly in the form of cash advances at a casino. In addition, the amount of credit card debt in relation to the Debtor's expected income, even when he was working full-time, appears rather excessive. Nevertheless, the Court found the Debtor to be a credible witness, and finds that based on his past performance as a gambler and his employment record, he genuinely believed he would be able to pay his debts, and had the intent to pay these credit card debts at the time he incurred them. The Debtor testified that he commonly gambled and used his winnings to supplement his income and to pay his bills in a timely fashion. The Court finds that he actually believed that he would be rehired by Central DuPage Hospital after a layoff of two months or less. That his belief was also reasonable is further evidenced by the fact that he was rehired several months after filing his bankruptcy case. The Debtor testified that if his gambling was unsuccessful, he was planning to make the requisite minimum payments from his salary. Transcript, p. 25.

Up until he was laid off, the Debtor was using the two credit cards in question at casinos, but had paid his balance in full. While most people may not believe that gambling is the most appropriate alternative means of support during a job layoff, the Court must make judgments on the debtor's financial decisions in this context only to the extent that they are relevant in determining fraud, or at least reckless disregard. In addition, the Court must base its decision on the record in the proceeding before it, not on its personal views of the morality of gambling and gambling debts.

The Debtor made one payment to AT & T while he was unemployed. The Debtor did not make charges on either credit card once he was informed that he exceeded his credit limit and should refrain from using these resources. The Court would be stretching the limitations of the facts of this proceeding to find that by taking these cash advances, the Debtor intentionally misrepresented AT & T and FCC that he had the intent repay them in full. Therefore, the Court finds that the Debtor used these credit cards with the intent to repay these two lenders.

The Court concludes that the use of the credit cards issued by the Plaintiffs does not amount, per se, to a representation of anything for purposes of a section 523(a)(2)(A) analysis. In terms of the Debtor's intent to defraud, the record supports a finding that when he incurred the debts, the Debtor actually believed he would be able to repay these two credit card debts and intended to do so from his future earnings and any gambling winnings. Finally, the Creditors presented

---

bank, *South Dakota, N.A.,* 167 B.R. 181 (9th Cir. BAP 1994).

**19.** The fact that this debt was incurred at a casino, while of little legal relevance, adds an interesting factor to this analysis. Gambling debt provokes some especially strong reactions in bankruptcy cases. Fact-finders often seem to presume that this type of debt must be nondischargeable. Clearly, the majority view is that proof of a genuine believe in one's ability to win at gambling does not establish the requisite intent. *See, e.g., Chemical Bank v. Clagg,* 150 B.R. 697, 698 (Bankr.C.D.Ill.1993). This Court knows of no legal rule which establishes that a debtor who hoped to win at gambling per se cannot show that the requisite intent to repay; "there is no basis for treating a debt that arose from legal gambling any differently from other debts legally incurred. Debtor's gambling activities are significant only as they relate to his intent to repay." *Clagg,* 150 B.R. at 698; *see Chase Manhattan Bank v. Murphy,* 190 B.R. 327,

330–31 (Bankr.N.D.Ill.1995). Because the nondischargeability provisions are aimed generally at debtors who have committed fraud or other malfeasance, the provisions were not intended to deny discharge of certain debts to debtors who made significant, albeit patently unreasonable, financial miscalculations. A Debtor's "honest but somewhat questionable belief that he would soon get lucky at gambling and pay off his debts" can defeat a finding of the requisite scienter. *First Federal of Jacksonville v. Landen,* 95 B.R. 826 (Bankr.M.D.Fla.1989).

One must remember that it is the creditor that initially bears the burden to prove that the debtor did not intend to repay; only if the creditor shows this by a preponderance of the evidence is the debtor required to justify his intent to repay and the reasonableness of his belief to that end. If Congress intended for all debts incurred in connection with gambling to be found non-dischargeable, it could have done so. It did not single out gambling debts for any special treatment in bankruptcy cases.

no evidence that they relied justifiably on representations of the Debtor. Because the Creditors failed to sustain their burden to prove the requirements of section 523(a)(2)(A) by a preponderance of the evidence, the Court grants the Debtor's motion for a verdict on partial findings and rules in favor of the Debtor on the underlying complaint to determine dischargeability. All of the debts owed by the Debtor to AT & T and FCC are dischargeable.

### Order

For the reasons stated in this memorandum opinion, the Court grants the Debtor's motion for judgment on partial findings and therefore rules in favor of the Debtor on the Plaintiffs' Complaints to Determine Dischargeability. The debts of the Debtor, Tanvir Alvi, to the Plaintiff Creditors AT & T Universal Card and FCC National Bank are dischargeable. The Plaintiffs' Complaints are dismissed.