**In re Thomas Mark RICH, Debtor.**

**Universal Bank, N.A., Plaintiff,**

**v.**

**Thomas Mark Rich, Defendant.**

**Bankruptcy No. 99–42678–BJH–7. Adversary No. 99–4134.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

June 23, 2000.

John M. Saltarelli, Ross & Matthews, P.C., Ft. Worth, TX, for Debtor/Defendant.

Mark Stromberg, Shields, Britton & Fraser, Dallas, TX, for Plaintiff.

## *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

This Complaint for Nondischargeability of Debt (the "Complaint") was tried on May 4, 2000. Universal Bank, N.A. ("Universal" or "Plaintiff") seeks a determination that its debt is nondischargeable, and a recovery of costs and reasonable attorney's fees. Debtor seeks a determination that his debt to Universal is dischargeable, a determination that Universal was not substantially justified in bringing the Complaint, and a recovery of costs and reasonable attorney's fees. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding. 28 U.S.C. § 157(b). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

Five issues will be addressed. First, whether Debtor made any representation to Universal that was false. The Court finds that Universal failed to prove that Debtor made any representations to it, false or otherwise.

Second, whether Debtor made misrepresentations to Universal with the intent to deceive. The Court finds that Universal failed to prove that (i) under the totality of circumstances Debtor incurred the charges with the intent to deceive, or (ii) Debtor incurred the charges while hopelessly insolvent from which a finding of intent to deceive may be inferred.

Third, whether Universal actually and justifiably relied on any misrepresentation made by Debtor. The Court finds that Universal failed to prove either element of reliance.

Fourth, whether Universal was substantially justified in bringing the Complaint. Because Universal failed to prove that its debt is nondischargeable under § 523(a)(2)(A), the Court finds that Universal failed to prove that it was substantially justified in bringing the Complaint.

Fifth, whether special circumstances exist that would make an award of costs and reasonable attorney's fees unjust. The Court finds that Universal failed to prove special circumstances that would make an award of costs and reasonable attorney's fees unjust. Thus, the Court concludes that Debtor is entitled to recover his costs and reasonable attorney's fees in defending against the Complaint.

### I. *Contentions of the Parties*

Universal contends that beginning in October 1998, Debtor began "a systematic withdrawal of the entire available credit line" on the credit card issued by Universal; that Debtor did not have the ability to repay Universal; that Debtor knew or should have known that he did not have the ability to repay Universal or that he incurred the debt with reckless disregard of his ability to repay; and that Debtor failed to inform Universal of his changed financial circumstances. Complaint, ¶¶ 10, 11. In addition to its claimed damages, Universal seeks a recovery of its costs and reasonable attorney's fees in bringing the Complaint.

Debtor contends that while his financial circumstances had changed, he was under no obligation to inform Universal of that change; that at the time he incurred charges on the credit card issued by Universal he intended to repay Universal for those charges; that the charges were for necessities, not luxuries; that the charges were not incurred in contemplation of a bankruptcy filing; and that Universal was not substantially justified in bringing the Complaint. Debtor seeks a recovery of his costs and reasonable attorney's fees in defending against the Complaint.

### II. *The Underlying Facts*

Universal issued a credit card to Debtor with the account number 5396–4190–0091–3189 (the "Credit Card"). Although no evidence was offered regarding how the

Credit Card came to be issued, Universal's representative, Susan Metz ("Metz"), testified that at the time the account was opened in October 1994, Debtor would have received a "welcome packet" with the Credit Card because all new cardholders receive a welcome packet. In addition to the credit card, the welcome packet contains the credit agreement.[1] Metz further testified that at the time the Credit Card was issued, Debtor had an "exceptional" credit rating.[2] While no evidence was offered regarding the credit limit(s) available to Debtor on the Credit Card when the account was initially opened, from June 1998 until the account was closed in March 1999, Debtor had a credit limit of $15,000.00. *See* Plaintiff's Exhibit 2. Metz testified that Debtor maintained a satisfactory relationship with Universal from October 1994 until shortly before the account was closed.[3] Universal brought the Complaint based upon a review of charges incurred on the account after Debtor filed Chapter 7.

Although no evidence was offered concerning Debtor's income at the time the Credit Card was issued, Debtor had reported income of $56,101 for 1996; $56,032 for 1997; $10,200 for 1998; and $12,500 for the first half of 1999. *See* Plaintiff's Exhibit 4. Debtor obtained a business management degree from TCU in 1972. Debt-

or testified that during his working career, he had generally worked in marketing and sales, but that his responsibilities had not included finance.

Debtor worked for Gunn Chevrolet in different capacities, including sales and fleet manager positions, through the end of 1997. Beginning in January 1998, Debtor worked for International Heritage, a multi-level marketing company, and was essentially self-employed. Debtor testified that he believed that once he became established, he could make more money working for International Heritage than he had previously made in sales for other companies. This belief was supported by Debtor's understanding of the income levels of his co-workers. Debtor testified that to his surprise, International Heritage "went bankrupt" in October 1998. Debtor began working for his current employer, Bradford, in October 1998 selling business seminars on commission. Debtor initially believed he would make in excess of $6,000–$7,000 per month at Bradford. In late 1998, Debtor realized that he had not taken the lead time necessary to reach that income level into account and that his current Bradford income would not allow him to service his aggregate debt.

Between October 1998 and March 1999, charges were incurred on the Credit Card

---

1. The credit agreement underlying the Credit Card was not offered into evidence.

2. Metz testified that Universal: (i) uses credit scores calculated under the Fair Isaac Company methodology ("FICO score") to evaluate potential and existing cardholders, (ii) offers and/or issues credit cards to individuals with a FICO score of 680 or above, (iii) suspends the accounts of persons whose FICO score falls below 650, and (iv) checks the FICO scores of all of its cardholders every two months to determine if it should suspend an account. When Debtor's credit was first reviewed by Universal, he had a FICO score of 765. Metz testified that in her work as a bankruptcy specialist for Universal, she had never seen a person with a FICO score higher than that. Metz testified that Universal monitored Debtor's FICO score and that it was sufficient to warrant offering Debtor a credit

account (a score of 680) even as late as August 15, 1998. Metz testified that Debtor's FICO score was 669 on October 15, 1998; 668 on December 15, 1998; 654 on February 15, 1999 and 501 on April 15, 1999. The Credit Card was not used after January 24, 1999. Universal notified Debtor that his account had been closed in its billing statement dated February 19—March 18, 1999. *See* Plaintiff's Exhibit 2.

3. Metz testified that until Debtor failed to make the minimum payment due on the Credit Card, Universal was unaware of Debtor's worsening financial condition. The billing statements introduced into evidence show that Debtor failed to make the minimum payment due on January 12, 1999 of $560.00. *See* Plaintiff's Exhibit 2 (November 19—December 18 Statement).

in the amount of $4,746.26.[4] *See* Plaintiff's Exhibit 2. During that same period, Debtor accrued $1,496.99 in finance charges and fees on the Credit Card. *Id.* Debtor admits that he made charges and took cash advances during this period on other credit cards.[5] *See* Plaintiff's Exhibit 1; Plaintiff's Exhibit 3. However, the extent of the charges and cash advances on other credit cards during this period was not proven at trial.

Debtor made the minimum payments due to Universal in August, September, October, November and December 1998. *See* Plaintiff's Exhibit 2. Debtor made no further payments to Universal after the December 1998 payment. Additional purchases were made on the Credit Card in the amount of $529.92 after the December 1998 payment, but these charges were incurred prior to Debtor being notified that he had exceeded his credit limit. *See* Plaintiff's Exhibit 2 (January 19—February 18 Statement).

The December 19—January 18, 1999 Statement (received in late January 1999) contained the following warning: "Your account is past due $305.00. In order to avoid suspension of your charging privileges, please remit this amount immediately." *See* Plaintiff's Exhibit 2. The January 19—February 18, 1999 Statement (received in late February 1999) contained the following warning: "Your minimum payment includes overlimit and past due amounts. As required by law, you are being notified that a negative credit report

has been submitted to a credit reporting agency for your failure to fulfill the terms of your credit agreement. Please remit your payment immediately." *See* Plaintiff's Exhibit 2. The February 19—March 18, 1999 Statement (received in late March 1999) contained the following warning: "Your account is seriously past due by $937.00 and has been closed to further use. Please remit this amount immediately." *See* Plaintiff's Exhibit 2. When the account was closed, the balance due on the Credit Card was $15,494.56.

Debtor first considered filing for bankruptcy shortly before his first meeting with his bankruptcy attorney on January 21, 1999. Only one charge (in the amount of $42.00) was incurred on the Credit Card after Debtor met with his bankruptcy attorney. Debtor filed his voluntary Chapter 7 petition on May 20, 1999 (the "Petition Date"). Debtor scheduled his debt on the Credit Card at $15,837.29. *See* Plaintiff's Exhibit 4. Debtor scheduled his total unsecured credit card debts at approximately $110,000. *Id.*

III. *The Dischargeability Complaint*

A. *Elements of a § 523(a)(2)(A) Complaint.*

Section 523(a)(2)(A) of the Bankruptcy Code provides:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the

---

**4.** While Universal introduced Credit Card billing statements from June 1998 through March 1999 (*see* Plaintiff's Exhibit 2), the Complaint alleged that Debtor began a pattern of "systematic withdrawals" beginning in October 1998. Complaint, ¶ 10. Debtor testified that his son (who was then in college) had made most of the charges on the Credit Card, but that Debtor was aware of, had authorized, and was responsible for the charges. A review of all billing statements introduced into evidence reveals that most of the individual charges incurred on the Credit Card from June 1998 until the account was closed were under $100.00; five (5) charges were between $100.00 and $200.00; two (2)

charges were between $200.00 and $300.00; two (2) charges were between $300.00 and $400.00; and three (3) charges were over $600, with the largest individual charge being $1,311.88. The total amount of charges incurred on the Credit Card between June 1998 and March 1999 was $5,897.81. *See* Plaintiff's Exhibit 2. These charges were for ordinary living expenses. No charge was for a luxury good.

**5.** When Debtor filed Chapter 7 on May 20, 1999, Debtor had other credit card debt of approximately $95,000.00. *See* Plaintiff's Exhibit 4.

extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

11 U.S.C. § 523(a)(2)(A).

■■■ A creditor must prove its claim of nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 211 F.3d 214, 216–17 (5th Cir.2000); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995). In order for a debtor's representation to be a false representation or pretense, a creditor must show that the debtor: (1) made a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the creditor; (4) who thereby suffered a loss. *In re Mercer*, 211 F.3d at 216–17; *RecoverEdge*, 44 F.3d at 1292–93. In order to prove nondischargeability under an "actual fraud" theory, the objecting creditor must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations. *RecoverEdge*, 44 F.3d at 1292. The creditor must show that it actually and justifiably relied on the debtor's representations. *Field v. Mans*, 516 U.S. 59, 69–70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *In re Mercer*, 211 F.3d 214, 216–17 (5th Cir.2000).

**B.** *Did Debtor Make a Representation, False or Otherwise, to Universal?*

■■■ Universal presumes that incurring a charge on a credit card is a representation. Universal did not offer any evidence that Debtor made any representation to it,

other than the presumed or implied representations allegedly flowing from use of the Credit Card. For the reasons articulated in both *GM Card v. Cox (In re Cox )*, 182 B.R. 626 (Bankr.D.Mass.1995) and *AT & T Universal Card Servs. v. Alvi (In re Alvi )*, 191 B.R. 724 (Bankr.N.D.Ill.1996), this Court declines to adopt the so-called "implied representation" theory. Instead, this Court concludes that use of a credit card to incur debt does not necessarily involve a representation as a matter of fact or law.

Some courts have held that upon use of a credit card, the credit card holder represents that he has the intention (and, in some courts, the ability) to pay for the charges incurred.[6] These courts have adopted the implied representation theory. As recognized by the *Cox* court, the courts that rely upon the implied representation theory generally fall into two camps. *In re Cox*, 182 B.R. at 626. First, those courts that

> hold, as a matter of law, the debtor impliedly represents he intends to pay when he makes a credit card charge. These courts permit, but do not require, a second inference—that the debtor did not intend to pay. This second inference is typically based on the debtor's insolvency in either the bankruptcy sense (excess of liabilities over assets) or the equity sense (inability to pay debts as they mature). Seldom do the courts concern themselves with the debtor's ability to make the minimum monthly payment. In many of the decisions, the courts construct an elaborate list of circumstances to be taken into account in determining the presence or absence of intent to pay.

*Id.* at 633 (footnotes omitted).

The second camp includes those courts that hold that a debtor impliedly represents both his intent and ability to pay

---

**6.** The divergent views on the validity of the implied representation theory are captured in *In re Mercer*, 211 F.3d 214, where each judge on the panel reaches a different conclusion regarding the theory in a separate opinion.

when he makes a credit card charge. As noted by the *Cox* court, these courts

> show no recognition that implied representation of ability to pay is expressly excluded from the statute. And it is often difficult to determine which implied representation—of ability or intent—the court bases its holding upon. In some decisions, the court seems to rely upon both.

*Id.* at 634 (footnote omitted).

The United States Supreme Court has held that passing a bad check is not a "false statement" in the context of 18 U.S.C. § 1014 because the issuance of a check is not an implied representation by the payor that there are sufficient funds in the checking account to cover the check. *Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) ("[T]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' ").

As noted by the *Alvi* court, most of the courts adopting the implied representation theory have failed to take the check cases and the Supreme Court's decision in *Williams* into consideration. *In re Alvi*, 191 B.R. at 732. This Court agrees with the conclusion reached by the *Alvi* court that

> [t]he similarities between the issuance of a check and the use of a credit card are sufficient to make it illogical to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a bad check does not, per se,

involve a representation. Just as the Supreme Court has held a check is not capable of being true or false, using a credit card to incur debt in of itself is not capable of being true or false.

*Id.*

Moreover, it is illogical to "imply" a representation of intent to repay from use of a credit card because the cardholder has already expressly agreed in the credit agreement to pay for all charges incurred on the card. The courts adopting the implied representation theory are creating a fictional representation because the cardholder's breach of contract when he fails to pay his credit card debt is insufficient as a matter of law to support a nondischargeability complaint. If Congress intended to make breach of contract a basis for a nondischargeability complaint, the Code should be amended to so provide. Courts should not create a fictional representation flowing from use of the credit card to enable credit card companies to pursue debtors who otherwise made no express misrepresentations to them.[7]

■ Because Universal failed to identify any representation made to it by Debtor other than those it implies from Debtor's use of the Credit Card, the Court concludes that Universal failed to prove that Debtor made a misrepresentation to it.[8]

### C. *Did Debtor Intend to Deceive Universal?*

For Debtor's debt to Universal to be nondischargeable under § 523(a)(2)(A), Universal must show not only that Debtor

---

7. If there is an implied representation of intent to pay flowing from use of a credit card, shouldn't there be a similar implied representation of intent to pay flowing to utility companies when debtors turn on the lights or stove or use their telephones or to landlords when debtors continue to occupy leased premises? Of course, that is equally illogical and is not the law.

8. Even if this Court were to apply the implied representation theory and conclude that Debtor made an implied representation of his intent to repay Universal when he used the

Credit Card, see *In re Mercer*, 211 F.3d at 226–27 (Barksdale, J., dissenting), Universal failed to prove that Debtor's implied representation of intent to repay was false. Specifically, the Court finds that when charges were incurred on the Credit Card through December 1998, Debtor believed that he would be able to service his debt to Universal in accordance with the credit agreement. Six additional charges totaling $453.90 were incurred on the Credit Card by Debtor's son at college after January 1, 1999.

obtained extensions of credit through false representations, but that Debtor made those misrepresentations with "scienter."[9] *Field,* 516 U.S. at 67–68, 116 S.Ct. 437. Universal contends that this Court should find that Debtor intended to deceive Universal because Debtor "knew or should have known of [his] inability to repay" or because Debtor "incurred the debt with reckless disregard" as to his ability to repay. Complaint, ¶ 10.

As noted by the *Alvi* court,

[i]t is difficult for a fact-finder to discern a debtor's state of mind at the time he incurred the debt regarding his intent to repay this debt in the future. Intent to repay usually must be established by circumstantial evidence. Therefore, courts sometimes look to the 'totality of circumstances' to determine whether a debtor incurred the credit card debt with the requisite scienter. This has prompted some courts to try to employ an objective formulaic approach to determine whether the debtor acted with the intent required by section 523(a)(2)(A). Factors which courts have considered in determining whether a debtor intended to repay include the following: 1. The length of time between charges made and bankruptcy filing. 2. Whether an attorney was consulted regarding bankruptcy before the charges were made. 3. The number of charges made. 4. The amount of the charges. 5. The debtor's financial condition when the charges were made. 6. Whether the charges exceeded the credit limit of the card. 7. Whether multiple charges were made on the same day. 8. Whether the debtor was employed. 9. The debtor's prospects for employment. 10. The debtor's financial sophistication. 11. Sudden changes in the debtor's buying habits. 12. Whether the purchases were for luxuries or necessities.

*Alvi,* 191 B.R. at 733 (citations omitted). Where a debtor was hopelessly insolvent at the time the charges were incurred, fraudulent intent may be inferred. *Sears, Roebuck & Co. v. Boydston (In re Boydston ),* 520 F.2d 1098, 1101 (5th Cir.1975). Some courts have combined these approaches by concluding that a court must look at the totality of the circumstances to determine whether the debtor knew or should have known at the time the credit card was used that the debtor was insolvent and lacked the ability to repay the charge, in which case, fraudulent intent may be inferred. *See, e.g., East v. AT & T Universal Card Services Corp.,* No. Civ. A 3:99–CV–0642, 1999 WL 425886, *5 (N.D.Tex. June 23, 1999).

██ This Court will analyze the factors identified under the rubric "totality of the circumstances" and comment on their applicability here:

1. *The length of time between the charges made and bankruptcy filing.*

Here, the charges complained of were incurred between October 1998 and the end of January 1999. Debtor consulted with his bankruptcy attorney on January 21, 1999. Debtor filed bankruptcy on May 20, 1999. Universal examined Debtor carefully about his delay in filing. Debtor testified that he "did not know" why he had delayed four months before filing. However, this delay would be of more significance to the Court if Debtor had used the Credit Card to purchase luxury goods or services, or to obtain cash advances, and then had delayed his bankruptcy filing to avoid the application of § 523(a)(2)(C). However, Debtor did not use the Credit Card to purchase any luxuries or to obtain cash advances. All charges incurred were for ordinary living expenses.

---

9. While Universal's failure to prove either the first or second element of a dischargeability cause of action under § 523(a)(2)(A) (*i.e.,* that Debtor made a representation to it that Debt- or knew was false) causes the Complaint to fail, this Court will address the remaining elements of the case.

2. *Whether an attorney was consulted regarding bankruptcy before the charges were made.*

Substantially all of the charges were incurred before Debtor met with his bankruptcy attorney on January 21, 1999. Only one charge (in the amount of $42.00) was incurred after that date.

3. *The number of charges made, the amount of the charges, sudden changes in the debtor's buying habits.*

The number of charges made was fairly small, the amount of the charges was generally small (*see supra* note 4), and there was no showing of a sudden change in Debtor's buying habits. *See* Plaintiff's Exhibit 2. In fact, Metz testified that there were no "red flags" on Debtor's account due to changes in spending habits and that Debtor's charges were "within pattern."

4. *The debtor's financial condition when the charges were made; whether Debtor was employed.*

Debtor admitted that his income in 1998 was not sufficient to meet his monthly living expenses. However, Debtor was employed and believed that his income would be increasing. While that belief may have been naive, there was no showing that it was not sincerely held.

Specifically, the evidence showed that Debtor changed jobs in January 1998 and began working for a "multi-level marketing" company, International Heritage. Debtor testified that in a multi-level marketing company, income increases as more people get involved and that he believed that once he got established ("built his lines"), his income would significantly increase. Debtor testified that he based his income expectations on what co-workers were actually earning, "a friend of mine made $60,000.00 over four months." While Debtor agreed that he had only made approximately $5,000.00 during his association with International Heritage, he testified that he "was not disappointed" because he believed he was still "filing up his pipeline." Debtor testified that he "never believed" he would not be able to pay his credit card debt during this time period even though he recognized that he was not earning enough to pay his monthly expenses. Debtor further testified that International Heritage's bankruptcy filing came as a "complete surprise."

After International Heritage filed bankruptcy, Debtor began working for his current employer, Bradford, selling business seminars on commission. Debtor testified that he still believed that he would be able to service his debts because he "hoped to move his contacts over" and that he expected to make between $5,000—$10,000 per month by the end of 1998. When Debtor "didn't see money coming in like I had anticipated," Debtor went to see a bankruptcy attorney. Debtor testified that he had expected to repay the debt "up until that time."

5. *Whether the charges exceeded the credit limit of the card.*

Other than finance charges and late fees, only one charge was incurred that exceeded Debtor's credit limit.

6. *Whether multiple charges were made on the same day.*

From October 1998 until the account was closed, multiple charges were incurred on the Credit Card on the same day on only four occasions: October 9, 1998 (2 charges totaling $803.12); October 28, 1998 (2 charges totaling $10.10); November 5, 1998 (2 charges totaling $339.09); and November 28, 1998 (2 charges totaling $309.60). *See* Plaintiff's Exhibit 2.

7. *The debtor's financial sophistication.*

While Debtor has a college degree in business management, he showed no particular financial sophistication. Debtor testified that his employment responsibili-

ties included marketing and sales rather than finance.

8. *Whether the purchases were for luxuries or necessities.*

The purchases were for ordinary living expenses or necessities, not luxuries.

After considering each of these factors, the Court finds that the "totality of circumstances" weigh in favor of Debtor's debt to Universal being dischargeable.

 While intent to deceive may be inferred from "hopeless insolvency," *In re Boydston,* 520 F.2d at 1101, Universal failed to prove that when Debtor incurred the charges at issue in the Complaint he was hopelessly insolvent. While Debtor had significant other credit card debt at the Petition Date, Universal failed to offer any specific evidence as to when that debt was incurred. Debtor testified that his aggregate credit card debt was accumulated over several years (back to 1995 or possibly 1996), but when asked to state how much of that debt had been incurred in the second half of 1998, Debtor could not recall. Debtor admitted that he had used other credit cards from June 1998 to March 1999, but no specific testimony regarding amounts was introduced.[10] *See also* Plaintiff's Exhibit 1.

Universal asks this Court to speculate or infer that substantial of Debtor's other credit card debt was in existence by June 1998. On this record, the Court cannot make such a finding. Universal cannot rely upon Debtor's alleged "hopeless insolvency" to satisfy the scienter requirement of § 523(a)(2)(A).

D. *Did Universal Actually and Justifiably Rely Upon a Representation by Debtor?*

 Universal failed to prove that it actually relied upon even an implied representation by Debtor that he intended to repay the debt for several reasons. First, reliance by one contracting party upon the other's implied representation of intent to pay is unrealistic. A party extending credit under a contract relies upon the other's express promise to pay contained in that contract, not a later implied representation of intent to pay flowing from performance. Here, Universal furnished Debtor with a credit agreement. Metz testified that the credit agreement included a promise by Debtor to pay for all card charges, including charges in excess of the card's credit limit, plus interest and attorney's fees. With Universal in possession of that express promise, it would be illogical to conclude that Universal relied upon a later implied representation of intent to pay emanating from Debtor's use of the Credit Card. Use of the card did not create a separate contract. Debtor was merely exercising his rights under the credit agreement.

Second, Universal's credit investigation prior to issuance of a card also belies any reliance, and certainly justifiable reliance, upon an implied representation by Debtor of intent or ability to pay flowing from use of the Credit Card. Prior to issuing the Credit Card, Universal reviewed a credit bureau report on Debtor. Universal obviously relied upon that report and the FICO score Debtor's credit history supported. In light of Universal's reliance upon its earlier credit investigation and its continued reliance upon Debtor's FICO score, it is improbable that Universal relied upon any later implied representation of intent or ability to pay. Metz did not testify that Universal relied upon any implied representations by Debtor flowing from his use of the Credit Card.[11]

Finally, the mechanics involved in Debtor obtaining credit militate against a reli-

---

10. Universal apparently recognized the importance of it being able to prove the extent of and when the other credit card debt was incurred because they sought that information in discovery. *See, e.g.,* Plaintiff's Exhibit 3, Interrogatory 14. Debtor objected to answering that interrogatory on the grounds that it was "burdensome and harassing" and Universal never sought to compel a response.

11. Universal also contends in the Complaint that Debtor "failed to inform Plaintiff as to

ance finding. These mechanics include no transmitted communication from Debtor to Universal. The merchant simply passed the Credit Card through a computer and received Universal's computerized authorization. Prior to that authorization, all Debtor did was present the Credit Card to the merchant. It is unrealistic to infer an implied representation of intent to pay Universal, an absent party, from Debtor's transaction with the merchant. The merchant was looking for payment from Universal, not Debtor. After Universal authorized the transaction, Debtor signed the charge card slip. Because this promise is directed at Universal, one could infer a representation of intent to pay Universal from that act. But this occurred after Universal's authorization of the transaction, so that Universal was not relying upon it as a prior representation in making the authorization. Of course, Universal gave its authorization on the condition that a charge slip be signed, but that is something quite different from reliance upon a prior representation. The mechanics of the card transactions pose other difficulties concerning reliance beyond those created by chronology. Universal, through its computer, was relying only upon the presence or absence of program-triggering events—prior payment default, a transaction in excess of the Credit Card's credit limit, or the Credit Card having been stolen—to evaluate whether to authorize the requested charge.

For each of these reasons, Universal failed to prove that its debt is nondischargeable under § 523(a)(2)(A).

E. *Was Universal Substantially Justified in Bringing the Complaint?*

Section 523(d) provides:

his changed financial circumstances from the time that Defendant was initially granted credit." Complaint, ¶ 11. However, Metz admitted that the credit agreement does not contain such a requirement. If Universal wishes to rely upon representations of intent and ability to pay flowing from use of its credit cards, its credit agreement could be

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

 The award of attorney's fees under § 523(d) is within this Court's sound discretion. *See Universal Card Services Corp. v. Akins (In re Akins)*, 235 B.R. 866, 874–75 (Bankr.W.D.Tex.1999); *AT & T Universal Card Services, Inc. v. Nguyen (In re Nguyen)*, 235 B.R. 76, 91 (Bankr. N.D.Cal.1999). As the *Nguyen* court noted:

The court need not find that the plaintiff acted in bad faith or acted frivolously before fees and costs may be awarded. The court must only make the determination that the plaintiff proceeded past a point where it knew, or should have known, that it could not carry its burden of proof. "Substantially justified" has been interpreted to require that the plaintiff-creditor had a reasonable basis both in fact and in law to bring and pursue its nondischargeability action.

*Id.* (citations omitted).

 This Court recognizes that there is a split of authority with respect to the question of whether use of a credit card constitutes an implied representation of intent to repay. Thus, Universal could

revised to expressly provide that each use of the card constitutes a representation to Universal of both intent and ability to pay for each charge incurred. Moreover, if Universal wants its cardholders to be under an obligation to report changed financial circumstances, the credit agreement could be amended to so provide.

have brought the Complaint in a good faith belief that this Court would adopt the implied representation theory. However, Universal failed in its burden of proof with respect to all other elements of its nondischargeability Complaint. In light of these failures of proof, the Court concludes that Universal was not substantially justified in bringing the Complaint.

In accordance with § 523(d), Debtor is entitled to a recovery of costs and reasonable attorney's fees incurred in defending against the Complaint. Based upon the testimony of Debtor's counsel, Debtor incurred reasonable attorney's fees in defending against the Complaint of $1,250.00.

A Judgment declaring the Universal debt to be dischargeable and allowing Debtor costs and reasonable attorney's fees of $1,250.00 will be entered separately.