**In re Stacy Renea KUNTZ, Debtor.**

**Universal Bank, N.A., Plaintiff,**

v.

**Stacy Renea Kuntz, Defendant.**

**Bankruptcy No. 499–44289–BJH–7. Adversary No. 99–4196.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

June 23, 2000.

John Park Davis, Davis Law Firm, Hurst, TX, for Debtor/Defendant.

Mark Stromberg, Shields, Britton & Fraser, Dallas, TX, for Plaintiff.

## *MEMORANDUM OPINION*

BARBARA J. HOUSER, Bankruptcy Judge.

This Complaint for Nondischargeability of Debt (the "Complaint") was tried on June 15, 2000. Universal Bank, N.A. ("Universal" or "Plaintiff") seeks a determination that its debt is nondischargeable, and a recovery of costs and reasonable attorney's fees. Debtor seeks a determi-

nation that her debt to Universal is dischargeable, a determination that Universal was not substantially justified in bringing the Complaint, and a recovery of costs and reasonable attorney's fees. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding. 28 U.S.C. § 157(b). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

Five issues will be addressed. First, whether Debtor made any representation to Universal that was false. The Court finds that Universal failed to prove that Debtor made any representations to it.

Second, whether Debtor made any representations to Universal with the intent to deceive. The Court finds that Debtor incurred the charges while hopelessly insolvent from which a finding of intent to deceive may be inferred.

Third, whether Universal actually and justifiably relied on any misrepresentation made by Debtor. The Court finds that Universal failed to prove either element of reliance.

Fourth, whether Universal was substantially justified in bringing the Complaint. Because Universal failed to prove that its debt is nondischargeable under § 523(a)(2)(A), the Court finds that Universal failed to prove that it was substantially justified in bringing the Complaint.

Fifth, whether special circumstances exist that would make an award of costs and reasonable attorney's fees unjust. The Court finds that Universal failed to prove special circumstances that would make an award of costs and reasonable attorney's fees unjust. Thus, the Court concludes that Debtor is entitled to recover her costs and reasonable attorney's fees in defending against the Complaint.

### I. *Contentions of the Parties*

Universal contends that beginning in January 1999, Debtor began "a systematic withdrawal of virtually the entire available

credit line" on the credit card issued by Universal; that Debtor did not have the ability to repay Universal; that Debtor knew or should have known that she did not have the ability to repay Universal or that she incurred the debt with reckless disregard of her ability to repay; and that Debtor failed to inform Universal of her changed financial circumstances. Complaint, ¶¶ 10, 11. In addition to its claimed damages, Universal seeks a recovery of its costs and reasonable attorney's fees in bringing the Complaint.

Debtor contends that she was under no obligation to inform Universal of any change in her financial circumstances; that at the time she incurred charges on the credit card issued by Universal she intended to repay Universal for those charges; that the charges were for necessities, not luxuries; that the charges were not incurred in contemplation of a bankruptcy filing; and that Universal was not substantially justified in bringing the Complaint. Debtor seeks a recovery of her costs and reasonable attorney's fees in defending against the Complaint.

## II. *The Underlying Facts*

Debtor received a pre-approved application from Universal for a credit card. After a lengthy screening process, Universal issued a credit card to Debtor with the account number 5398–4090–0091–2693 (the "Credit Card") on July 22, 1994. Universal's representative, Susan Metz ("Metz"), testified that at the time the account was opened in July 1994, Debtor would have received a "welcome packet" with the Credit Card because all new cardholders receive a welcome packet. In addition to the credit card, the welcome packet contains the credit agreement.[1] Metz further testified that at the time the Credit Card was issued, Debtor had a "very good" credit rating.[2] While no evidence was offered regarding the credit limit(s) available to Debtor on the Credit Card when the account was initially opened, from January 1999 through May 1999, Debtor had a credit limit of $4,500.00. See Exhibit 3. Metz testified that prior to February 1999, nothing had occurred to cause Universal to question the account and that throughout the period from February 1999 through May 1999, Universal had no information to suggest that Debtor's financial situation had seriously declined. Universal brought the Complaint based upon a review of charges incurred on the account after Debtor filed Chapter 7.

Although no evidence was offered concerning Debtor's income at the time the Credit Card was issued, Debtor had reported income of $4,289.00 for 1997; $3,364.00 for 1998; and $65.52 for the first seven months of 1999. See Exhibit 2. Debtor testified that she has an associates degree in arts and sciences and that when she was employed, she worked in pet supply stores and animal clinics.

Between February 14, 1999 and May 11, 1999, charges were incurred on the Credit Card in the amount of $1,135.88.[3] See

1. The credit agreement underlying the Credit Card was not offered into evidence.

2. Metz testified that Universal: (i) uses credit scores calculated under the Fair Isaac Company methodology ("FICO score") to evaluate potential and existing cardholders, (ii) offers and/or issues credit cards to individuals with a FICO score of 680 or above, (iii) suspends the accounts of persons whose FICO score falls below 680, and (iv) checks the FICO scores of all of its cardholders every two months to determine if it should suspend an account. When Debtor's credit was first reviewed by Universal, she had a FICO score of 739. Metz testified that this was a "very good

score." Metz testified that Universal continued to monitor Debtor's FICO score and that her scores were about the 680 minimum threshold "at the time the charges were made." Debtor did not use the Credit Card after May 11, 1999. See Exhibit 3.

3. A review of the billing statements introduced into evidence reveals that most of the individual charges incurred on the Credit Card from February 14, 1999 through May 11, 1999 were under $100.00 (23 of 28 charges). Only 5 charges were over $100.00 and each of those charges was less than $200.00. See Exhibit 3. All charges were for

Exhibit 3. During essentially that same period Debtor took cash advances in the amount of $2,300.00 and accrued $256.92 in finance charges and fees on the Credit Card. *Id.* Debtor admits that she made charges and took cash advances during this period on other credit cards.[4] *See* Exhibit 4. However, the extent of the charges and cash advances on other credit cards during this period was not proven at trial.

Between February 14, 1999 and May 11, 1999, Debtor made one payment to Universal on March 22, 1999 in the amount of $100.00. *See* Exhibit 3. Additional purchases were made on the Credit Card in the amount of $420.65 after the March 1999 payment; however, no charges were incurred that exceeded Debtor's credit limit. *Id.* Finance charges and fees caused Debtor to exceed her credit limit by $24.20. *Id.*

The February 14—March 13, 1999 Statement (received in late March 1999) contained the following statement: "Possibly you have overlooked your minimum payment of $20.00. If the payment has already been mailed, thank you." *See* Exhibit 3. The March 14—April 13, 1999 Statement (received in late April 1999) contained no statement or warning. *Id.* The April 14—May 13, 1999 Statement (received in late May 1999) contained the following warning: "Your account is past due $86.00. In order to avoid suspension of your charging privileges, please remit this amount immediately." *Id.* When Debtor last used the Credit Card, the balance due was $4,524.20, with a minimum payment of $205.20. *Id.*

Debtor first considered filing for bankruptcy shortly before her first meeting with her bankruptcy attorney on April 19, 1999. *See* Exhibit 4. Only four charges in the amount of $177.76 were incurred on the Credit Card after April 19,1999. *See*

Exhibit 3. Debtor filed her voluntary Chapter 7 petition on August 16, 1999 (the "Petition Date"), although her Schedules and Statement of Financial Affairs were signed on June 1, 1999. *See* Exhibit 1. Debtor scheduled her total unsecured credit card debts at approximately $66,-714.00. *Id.*

### III. *The Dischargeability Complaint*

A. *Elements of a § 523(a)(2)(A) Complaint.*

Section 523(a)(2)(A) of the Bankruptcy Code provides:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt … for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. …

11 U.S.C. § 523(a)(2)(A).

A creditor must prove its claim of nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *AT & T Universal Card Servs. v. Mercer (In re Mercer)*, 211 F.3d 214, 216–17 (5th Cir.2000); *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995). In order for a debtor's representation to be a false representation or pretense, a creditor must show that the debtor: (1) made a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the creditor; (4) who thereby suffered a loss. *In re Mercer*, 211 F.3d at 216–17; *RecoverEdge*, 44 F.3d at 1292–93. In order to prove nondischargeability under an "actual fraud" theory, the objecting creditor must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the

---

ordinary living expenses. No charge was for a luxury good.

**4.** When Debtor filed Chapter 7 on August 16,1999, Debtor had other credit card debt of approximately $62,000.00. *See* Exhibit 1.

debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations. *RecoverEdge,* 44 F.3d at 1292. The creditor must show that it actually and justifiably relied on the debtor's representations. *Field v. Mans,* 516 U.S. 59, 69–70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *In re Mercer,* 211 F.3d at 216–17.

### B. *Did Debtor Make a Representation to Universal?*

■ Universal presumes that incurring a charge on a credit card is a representation. Universal did not offer any evidence that Debtor made any representation to it, other than the presumed or implied representations allegedly flowing from use of the Credit Card. For the reasons articulated in both *GM Card v. Cox (In re Cox),* 182 B.R. 626 (Bankr.D.Mass.1995) and *AT & T Universal Card Servs. v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr.N.D.Ill.1996), this Court declines to adopt the so-called "implied representation" theory. Instead, this Court concludes that use of a credit card to incur debt does not necessarily involve a representation as a matter of fact or law.

Some courts have held that upon use of a credit card, the credit card holder represents that he has the intention (and, in some courts, the ability) to pay for the charges incurred.[5] These courts have adopted the implied representation theory. As recognized by the *Cox* court, the courts that rely upon the implied representation theory generally fall into two camps. *In re Cox,* 182 B.R. at 626. First, those courts that

hold, as a matter of law, the debtor impliedly represents he intends to pay when he makes a credit card charge. These courts permit, but do not require,

a second inference—that the debtor did not intend to pay. This second inference is typically based on the debtor's insolvency in either the bankruptcy sense (excess of liabilities over assets) or the equity sense (inability to pay debts as they mature). Seldom do the courts concern themselves with the debtor's ability to make the minimum monthly payment. In many of the decisions, the courts construct an elaborate list of circumstances to be taken into account in determining the presence or absence of intent to pay.

*Id.* at 633 (footnotes omitted).

The second camp includes those courts that hold that a debtor impliedly represents both his intent and ability to pay when he makes a credit card charge. As noted by the *Cox* court, these courts

show no recognition that implied representation of ability to pay is expressly excluded from the statute. And it is often difficult to determine which implied representation—of ability or intent—the court bases its holding upon. In some decisions, the court seems to rely upon both.

*Id.* at 634 (footnote omitted).

The United States Supreme Court has held that passing a bad check is not a "false statement" in the context of 18 U.S.C. § 1014 because the issuance of a check is not an implied representation by the payor that there are sufficient funds in the checking account to cover the check. *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) ("[T]echnically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' ").

As noted by the *Alvi* court, most of the courts adopting the implied representation theory have failed to take the check cases and the Supreme Court's decision in *Williams* into consideration. *In re Alvi,*

---

**5.** The divergent views on the validity of the implied representation theory are captured in *In re Mercer,* 211 F.3d 214, where each judge

on the panel reaches a different conclusion regarding the theory in a separate opinion.

191 B.R. at 732. This Court agrees with the conclusion reached by the *Alvi* court that

> [t]he similarities between the issuance of a check and the use of a credit card are sufficient to make it illogical to conclude that the use of a credit card in an ordinary credit transaction necessarily invokes a representation, when the issuance of a bad check does not, per se, involve a representation. Just as the Supreme Court has held a check is not capable of being true or false, using a credit card to incur debt in of itself is not capable of being true or false.

*Id.*

Moreover, it is illogical to "imply" a representation of intent to repay from use of a credit card because the cardholder has already expressly agreed in the credit agreement to pay for all charges incurred on the card. The courts adopting the implied representation theory are creating a fictional representation because the cardholder's breach of contract when he fails to pay his credit card debt is insufficient as a matter of law to support a nondischargeability complaint. If Congress intended to make breach of contract a basis for a nondischargeability complaint, the Code should be amended to so provide. Courts should not create a fictional representation flowing from use of the credit card to enable credit card companies to pursue debtors who otherwise made no express misrepresentations to them.[6]

Because Universal failed to identify any representation made to it by Debtor other than those it implies from Debtor's use of the Credit Card, the Court concludes that Universal failed to prove that Debtor made a misrepresentation to it.[7]

### C. Did Debtor Intend to Deceive Universal?

For Debtor's debt to Universal to be nondischargeable under § 523(a)(2)(A), Universal must show not only that Debtor obtained extensions of credit through false representations, but that Debtor made those misrepresentations with "scienter." *Field,* 516 U.S. at 67–68, 116 S.Ct. 437. Universal contends that this Court should find that Debtor intended to deceive Universal because Debtor "knew or should have known of [her] inability to repay" or because Debtor "incurred the debt with reckless disregard" as to her ability to repay. Complaint, ¶ 10.

As noted by the *Alvi* court,

> [i]t is difficult for a fact-finder to discern a debtor's state of mind at the time he incurred the debt regarding his intent to repay this debt in the future. Intent to repay usually must be established by circumstantial evidence. Therefore, courts sometimes look to the 'totality of circumstances' to determine whether a debtor incurred the credit card debt with the requisite scienter. This has prompted some courts to try to employ an objective formulaic approach to determine whether the debtor acted with the intent required by section 523(a)(2)(A). Factors which courts have considered in determining whether a debtor intended to repay include the following: 1. The length of time between charges made and bankruptcy filing. 2. Whether an attorney was consulted regarding bankruptcy before the charges were made. 3. The number of charges made. 4. The amount of the charges. 5.

---

6. If there is an implied representation of intent to pay flowing from use of a credit card, shouldn't there be a similar implied representation of intent to pay flowing to utility companies when debtors turn on the lights or stove or use their telephones or to landlords when debtors continue to occupy leased premises? Of course, that is equally illogical and is not the law.

7. While Universal's failure to prove the first element of a dischargeability cause of action under § 523(a)(2)(A) (*i.e.,* that Debtor made a representation to it) causes the Complaint to fail (as Universal's counsel admitted at trial), this Court will address the remaining elements of the case to facilitate further review of this decision in the event of an appeal.

The debtor's financial condition when the charges were made. 6. Whether the charges exceeded the credit limit of the card. 7. Whether multiple charges were made on the same day. 8. Whether the debtor was employed. 9. The debtor's prospects for employment. 10. The debtor's financial sophistication. 11. Sudden changes in the debtor's buying habits. 12. Whether the purchases were for luxuries or necessities.

*Alvi,* 191 B.R. at 733 (citations omitted). Where a debtor was hopelessly insolvent at the time the charges were incurred, fraudulent intent may be inferred. *Sears, Roebuck & Co. v. Boydston (In re Boydston)*, 520 F.2d 1098, 1101 (5th Cir.1975). Some courts have combined these approaches by concluding that a court must look at the totality of the circumstances to determine whether the debtor knew or should have known at the time the credit card was used that the debtor was insolvent and lacked the ability to repay the charge, in which case, fraudulent intent may be inferred. *See, e.g., East v. AT & T Universal Card Services Corp.*, No. Civ. A 3:99–CV–0642, 1999 WL 425886, *5 (N.D.Tex. June 23, 1999).

This Court will analyze the factors identified under the rubric "totality of the circumstances" and comment on their applicability here:

1. *The length of time between the charges made and bankruptcy filing.*

Here, the charges complained of were incurred between February 14, 1999 and May 11, 1999. Debtor consulted with her bankruptcy attorney on April 19, 1999, signed paperwork necessary for the filing on June 1, 1999, but did not file her voluntary Chapter 7 petition until August 16, 1999. Universal examined Debtor carefully about her delay in filing. Debtor testified that she did not recall why she had delayed before filing. However, this delay would be of more significance to the Court if Debtor had used the Credit Card to purchase luxury goods or services, or to obtain cash advances, and then had delayed her bankruptcy filing to avoid the application of § 523(a)(2)(C). However, Debtor did not use the Credit Card to purchase any luxury goods. All charges incurred were for ordinary living expenses. While Debtor did obtain a $1,700.00 cash advance on her Credit Card on February 6, 1999 and another $600.00 cash advance on March 15, 1999, even if Debtor had filed on June 1, 1999 (the day her Schedules and Statement of Financial Affairs were signed), § 523(a)(2)(C) would not apply.

2. *Whether an attorney was consulted regarding bankruptcy before the charges were made.*

Substantially all of the charges were incurred before Debtor met with her bankruptcy attorney on April 19, 1999. Only four charges (in the amount of $117.76) were incurred after that date. *See* Exhibit 3.

3. *The number of charges made, the amount of the charges, sudden changes in the debtor's buying habits.*

Universal contends that there was a sudden change in Debtor's buying habits. Metz testified that Debtor initially used the Credit Card after it was issued to her, but then no charges were incurred on the Credit Card for a period of approximately 3½ years. Although no evidence was offered regarding when Debtor began using her Credit Card again, she had an outstanding balance on the Credit Card of $734.37 by early January 1999. *See* Exhibit 3. Thereafter, Debtor incurred $3,692.80 in outstanding charges on the account. However, the number of charges made was fairly small and the amount of the charges was generally small. *See supra* note 3.

4. *The debtor's financial condition when the charges were made; whether Debtor was employed.*

Debtor was essentially unemployed in 1999. Her income for seven months in

1999 was less than $100.00. Her income was insufficient to pay for the charges incurred on the Credit Card. Moreover, the combined income of Debtor and her spouse in 1999 was insufficient to meet their monthly living expenses without regard to making even minimum payments on any of the credit card debt. *See* Exhibit 1 (Schedules I & J). Debtor also testified that by late 1998 or early 1999 she was being "harassed daily" by other credit card companies that were attempting to collect amounts owing to them.

### 5. *Whether the charges exceeded the credit limit of the card.*

Debtor did not incur charges that exceeded her credit limit.

### 6. *Whether multiple charges were made on the same day.*

From February 1999 through May 1999, multiple charges were incurred on the Credit Card on the same day on only two occasions: February 20, 1999 (2 charges totaling $53.78) and March 9, 1999 (2 charges totaling $48.22). *See* Exhibit 3.

### 7. *The debtor's financial sophistication.*

While Debtor did attend college and obtained an associates degree in arts and sciences, she showed no particular financial sophistication.

### 8. *Whether the purchases were for luxuries or necessities.*

The purchases were for ordinary living expenses or necessities, not luxuries.

After considering each of these factors, the Court finds that the "totality of circumstances" weigh in favor of Debtor's debt to Universal being dischargeable.

■ However, intent to deceive may be inferred from "hopeless insolvency." *See In re Boydston,* 520 F.2d at 1101. As noted previously, Debtor was essentially unemployed in 1999. Her income for seven months in 1999 was less than $100.00.

Her income was insufficient to pay for the charges incurred on the Credit Card. Moreover, the combined income of Debtor and her spouse in 1999 was insufficient to meet their monthly living expenses without regard to making even minimum payments on any of the credit card debt. *See* Exhibit 1 (Schedules I & J). Universal elicited testimony from Debtor that while she was incurring the charges at issue in the Complaint, she was being "harassed daily" by other credit card companies that were attempting to collect the amounts owing to them. At the Petition Date, Debtor had other credit card debt of approximately $62,000.00. *See* Exhibit 1. Debtor's Chapter 7 was a "no asset" case. From these facts, the Court finds that Debtor was hopelessly insolvent in February 1999 and that this hopeless insolvency satisfies the scienter requirement of § 523(a)(2)(A).

### D. *Did Universal Actually and Justifiably Rely Upon a Representation by Debtor?*

■ Universal failed to prove that it actually relied upon even an implied representation by Debtor that she intended to repay the debt for several reasons. First, reliance by one contracting party upon the other's implied representation of intent to pay is unrealistic. A party extending credit under a contract relies upon the other's express promise to pay contained in that contract, not a later implied representation of intent to pay flowing from performance. Here, Universal furnished Debtor with a credit agreement. Metz testified that the credit agreement included a promise by Debtor to pay for all card charges, including charges in excess of the card's credit limit, plus interest and attorney's fees. With Universal in possession of that express promise, it would be illogical to conclude that Universal relied upon a later implied representation of intent to pay emanating from Debtor's use of the Credit Card. Use of the card did not create a separate contract. Debtor was

merely exercising her rights under the credit agreement.

Second, Universal's credit investigation prior to issuance of a card also belies any reliance, and certainly justifiable reliance, upon an implied representation by Debtor of intent or ability to pay flowing from use of the Credit Card. Prior to issuing the Credit Card, Universal reviewed a credit bureau report on Debtor. Universal obviously relied upon that report and the FICO score Debtor's credit history supported. Moreover, Metz testified that Universal is "hooked up with the credit bureaus electronically, and we're getting feeds from them every two months on every open account." Finally, Metz testified that Universal is "also checking accounts to see if the accounts go two months past due or if they go over their credit limit, or *if there is any fraud activity*." (Emphasis added). Metz testified that if any of these events occur, "then the account will be closed." [8]

In light of Universal's reliance upon its earlier credit investigation and its continued reliance upon Debtor's FICO score, it is improbable that Universal relied upon any later implied representation of intent or ability to pay. Metz did not testify that Universal relied upon any implied representations by Debtor flowing from her use of the Credit Card.[9]

Finally, the mechanics involved in Debtor obtaining credit militate against a reliance finding. These mechanics include no transmitted communication from Debtor to Universal. The merchant simply passed the Credit Card through a computer and received Universal's computerized authorization. Prior to that authorization, all Debtor did was present the Credit Card to the merchant. It is unrealistic to infer an implied representation of intent to pay Universal, an absent party, from Debtor's transaction with the merchant. The merchant was looking for payment from Universal, not Debtor. After Universal authorized the transaction, Debtor signed the charge card slip. Because this promise is directed at Universal, one could infer a representation of intent to pay Universal from that act. But this occurred after Universal's authorization of the transaction, so that Universal was not relying upon it as a prior representation in making the authorization. Of course, Universal gave its authorization on the condition that a charge slip be signed, but that is something quite different from reliance upon a prior representation. The mechanics of the card transactions pose other difficulties concerning reliance beyond those created by chronology. Universal, through its computer, was relying only upon the presence or absence of program-triggering events—prior payment defaults, a transaction in excess of the Credit Card's credit limit, or fraudulent activity on the ac-

---

**8.** This admission by Metz is of significance. Universal monitors each cardholder's account for fraudulent activity. If fraudulent activity is discovered, the account is closed. While Debtor was incurring the charges at issue here, Universal was monitoring the account for fraud, Universal authorized each charge and did not find fraudulent activity. Now, with the benefit of hindsight and so-called "implied representations" by Debtor, Universal seeks to have its debt declared nondischargeable for Debtor's alleged fraudulent activity.

**9.** Rather, Metz testified that Universal relied on Debtor's "history of payment that had previously existed as a basis for its *assumption* that the debtor would in fact pay." (Emphasis added). Universal also contends in the Complaint that Debtor "failed to inform Plaintiff as to her changed financial circumstances from the time that Defendant was initially granted credit." Complaint, ¶ 11. However, Metz admitted that the credit agreement does not contain such a requirement. If Universal wishes to rely upon representations of intent and ability to pay flowing from use of its credit cards, its credit agreement could be revised to expressly provide that each use of the card constitutes a representation to Universal of both intent and ability to pay for each charge incurred. Moreover, if Universal wants its cardholders to be under an obligation to report changed financial circumstances, the credit agreement could be amended to so provide.

count—to evaluate whether to authorize the requested charge.

For the reasons set forth above, Universal failed to prove that its debt is nondischargeable under § 523(a)(2)(A).

### E. *Was Universal Substantially Justified in Bringing the Complaint?*

Section 523(d) provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

The award of attorney's fees under § 523(d) is within this Court's sound discretion. *See Universal Card Services Corp. v. Akins (In re Akins )*, 235 B.R. 866, 874–75 (Bankr.W.D.Tex.1999); *AT & T Universal Card Services, Inc. v. Nguyen (In re Nguyen)*, 235 B.R. 76, 91 (Bankr. N.D.Cal.1999). As the *Nguyen* court noted:

> The court need not find that the plaintiff acted in bad faith or acted frivolously before fees and costs may be awarded. The court must only make the determination that the plaintiff proceeded past a point where it knew, or should have known, that it could not carry its burden of proof. "Substantially justified" has been interpreted to require that the plaintiff-creditor had a reasonable basis both in fact and in law to bring and pursue its nondischargeability action.

*Id.* (citations omitted).

This Court recognizes that there is a split of authority with respect to the question of whether use of a credit card constitutes an implied representation of intent to repay. Thus, Universal could have brought the Complaint in a good faith belief that this Court would adopt the implied representation theory. However, Universal also failed in its burden of proof with respect to the reliance element of its nondischargeability Complaint. In light of this failure of proof, the Court concludes that Universal was not substantially justified in bringing the Complaint.

In accordance with § 523(d), Debtor is entitled to a recovery of costs and reasonable attorney's fees incurred in defending against the Complaint. Based upon the testimony of Debtor's counsel, Debtor incurred reasonable attorney's fees in defending against the Complaint of $3,125.00.

A Judgment declaring the Universal debt to be dischargeable and allowing Debtor costs and reasonable attorney's fees of $3,125.00 will be entered separately.