In re Mark E. JARCZYK, Debtor.

Bank of America, Plaintiff,

v.

Mark E. Jarczyk, Defendant.

Bankruptcy No. 98–13060B.
Adversary No. 98–1240B.

United States Bankruptcy Court,
W.D. New York.

Sept. 20, 2000.

Kenneth R. Hiller, Amherst, NY, for Defendant.

Robert S. Cooper, Rochester, NY, for Plaintiff.

CARL L. BUCKI, Bankruptcy Judge.

In 1997, issuers of credit cards mailed approximately three billion solicitations to American consumers [1] and initiated a comparably incredible number of oral solicitations by telephone. The Bank of America directed one such call to Mark E. Jarczyk, who accepted an invitation to open a Visa credit card account in October of 1997. Promptly he began to use that card, and quickly accumulated an account balance. When Mr. Jarczyk thereafter filed a petition for relief under chapter 7 of the Bankruptcy Code, the Bank of America commenced the present adversary proceeding for a declaration that Jarczyk's obligation is excepted from discharge, and for a money judgment in the amount of $7,805.38. Although the parties have not yet completed discovery, Jarczyk has now moved for summary judgment. The central issue is whether the debtor fraudulently misrepresented an intent to repay his obligation.

This adversary proceeding arises under 11 U.S.C. § 523(a)(2)(A),[2] which provides that a discharge under chapter 7 does not discharge any debt for an extension of credit that is obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The complaint alleges that in using his credit card, Jarczyk impliedly represented an intent to repay any resulting debt, that the Bank of America justifiably relied upon this representation, that this representation was false, and that in making this representation, Jarczyk intended to deceive the plaintiff. Jarczyk has served and filed an answer that denies each of these allegations. In now moving for summary judgment, Jarczyk argues that his use of the credit card did not constitute a representation of intent to pay, and that even if an expression of intent is implied, the Bank of America did not rely on any such representation. The Bank of America disputes these contentions and urges that it be allowed to complete discovery, in preparation for a trial on its claim of actual fraud.

On this motion by the defendant for summary judgment, the court will presume the facts that the plaintiff has set forth in its responsive pleadings. Between October 21, 1997, and January 13, 1998, Jarczyk used his Bank of America Visa account to make purchases totaling $6,302.51, and to take cash advances of $1,313.00. The largest purchase was a snow plow, for a price of $4,071.60. In completing this transaction, Jarczyk signed a sales slip with the following notation: "Cardholder acknowledges receipt of goods and/or services in the amount of the Total [sic]

1. Joseph B. Cahill, *Credit Cards Get a Record Level of Solicitations*, WALL STREET JOURNAL, Apr. 9, 1999, at B9.

2. Notably, the Bank of America asserts no other basis for relief under 11 U.S.C. § 523(a). In particular, the plaintiff makes no claim of non-dischargeability under subdivision (6) of this section, which applies to debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

shown hereon and agrees to perform the obligations set forth in the Cardholder's agreement with the issuer." On March 11 of 1998, less than sixty days after taking his last cash advance, Jarczyk contacted an attorney for credit advice. He then filed a bankruptcy petition on May 6, 1998. With that petition, Jarczyk filed schedules listing unsecured debt in excess of $29,000. He further reported monthly living expenses of $2,893, a sum that exceeded his monthly take-home pay of $2,596. Thus, Jarczyk had no disposable income with which to make the minimum monthly payments on his unsecured obligations. Estimating that these minimum monthly payments were between $600 and $900, the Bank of America asserts that Jarczyk knew or should have known that he lacked an ability to repay the obligations that he was then incurring on his Visa account. Accordingly, the plaintiff would infer an intent not to repay at the time of Jarczyk's usage of the credit card.

The complaint contains no allegation that Jarczyk made any false representation at the time of the issuance of his Visa card. Rather, he requested the opening of an account in response to a telemarketing call that the plaintiff had initiated. The Bank of America determined the defendant's creditworthiness not from any written response to financial questions, but from a report that a credit agency generated without any request from Mr. Jarczyk. When asked in an interrogatory to describe the steps taken to determine creditworthiness, the plaintiff responded as follows:

The credit worthiness of potential cardholders is established by using a matrix approach submitted to a credit reporting agency or other marketing agency specializing in credit demographics to identify individuals within a geographic area who meet certain specific credit criteria including the number of credit accounts, the years employed at present employment, home ownership, credit rating, Fair Isaac Score, if applicable, and income.

In its decision to issue a credit card, the Bank of America simply did not rely upon any representation that the debtor might have made at the time of the card's procurement. Fraud, if it was to have occurred at all, could only have arisen from some subsequent representation. Here, the Bank of America alleges fraud in the use of the credit card at the time of each purchase or cash advance.

Bankruptcy and appellate courts have rendered many conflicting and inconsistent decisions about what might constitute the fraudulent use of a credit card. In an excellent article published in the American Bankruptcy Law Journal in 1998, Judge David F. Snow described a plethora of judicial views on this topic.[3] Some courts have followed the lead of the Eleventh Circuit in *First National Bank v. Roddenberry*, 701 F.2d 927 (1983), which essentially held that the issuer of a credit card assumed the risk of its misuse. *See, e.g. In re Cirineo*, 110 B.R. 754, 759–60 (Bankr.E.D.Pa.1990); *Comerica Bank–Midwest v. Kouloumbris*, 69 B.R. 229, 230–31 (N.D.Ill.1986); and *In re Shrader*, 55 B.R. 608, 611–12 (Bankr.W.D.Va.1985). While not presuming any risk assumption, other courts have achieved a similar result by holding that the use of a credit card entails no representation that might serve as a basis for fraud. *In re Alvi*, 191 B.R. 724 (Bankr.N.D.Ill.1996), *In re Kuntz*, 249 B.R. 699 (Bankr.N.D.Tex.2000). Still other courts have held that with each use of a credit card, a borrower impliedly represents either an intent to repay, *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277 (6th Cir.1998), *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280 (9th Cir.1996), or additionally, an ability to repay, *Universal Card Servs. v. Pickett (In re Pickett)*, 234 B.R. 748, 755 (Bankr.W.D.Mo.1999). In

**3.** David F. Snow, *The Dischargeability of Credit Card Debt: New Developments and the Need for a New Direction,* 72 Am. Bankr. L.J. 63 (1998).

deciding whether such representations are fraudulent, courts have applied at least two divergent approaches. Some courts have defined fraud by the totality of circumstances; others have required proof of the common law's traditional five elements of fraud. *Compare In re Sigrist,* 163 B.R. 940, 947 (Bankr.W.D.N.Y.1994) *with In re Lokotnicki,* 232 B.R. 583, 586–87 (Bankr. W.D.N.Y.1999).

Illustrating the sharp divergence of views about the fraudulent use of credit cards is the recent decision of a three judge panel for the Fifth Circuit in a case that the court has recently set for a rehearing *en banc. In re Mercer,* 211 F.3d 214 (2000), *motion for rehearing en banc granted* 218 F.3d 770 (2000). In the lead opinion of the three judge panel, Judge John Duhe held that when a lender issues "a pre-approved credit card with a pre-approved credit limit," the debtor makes no representation upon which the creditor may rely. 211 F.3d at 217. Thus, in Judge Duhe's view, the lender assumed the risk of any future borrowing. In a concurring opinion, Judge James Dennis disavowed an assumption of risk theory, and stated his view that with each use of a credit card, the borrower impliedly represents a promise to repay. Under the facts of *Mercer,* however, Judge Dennis found an absence of justifiable reliance, in that the plaintiff had failed to adequately assess the debtor's credit history and current financial condition. Judge Rhesa Hawkins Barksdale dissented. He agreed with Judge Dennis that the use of a credit card implied a representation of intent to pay. Barksdale would, however, adopt the view of the Ninth Circuit, that "the credit card issuer justifiably relies on a representation of intent to repay as long as the account is *not* in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable." 211 F.3d at 232, *quoting In re Anastas,* 94 F.3d 1280, 1286 (1996).

This court will not now attempt to duplicate the thoroughness of Judge Snow's review of case authority. Rather, it suffices to note that the litigants have cited no binding precedents, from either the Second Circuit or at the district court level from the Western District of New York, which address the difficult application of 11 U.S.C. § 523(a)(2)(A) to an allegedly fraudulent use of a credit card. Thus, we are at liberty to give fresh consideration to the requirements for proof of actual fraud as the basis for a determination of non-dischargeability.

Section 523(a)(2)(A) precludes the discharge of debts obtained through either false pretenses, or a false representation, or actual fraud. Let us begin our analysis with actual fraud. Because these three bases for non-dischargeability are similar, a disposition of the claim for actual fraud will allow a ready resolution of any claim of false pretenses or a false representation.

■ The Bank of America does not allege any false representation of ability to repay. In the view of this court, such a statement "respecting the debtor's ... financial condition" is not actionable under subdivision (A) of 11 U.S.C. § 523(a)(2), but becomes actionable only when in writing under the terms of subdivision (B) of this same section. *MBNA Consumer Servs., Inc. v. Jackson (In re Jackson),* 252 B.R. 877 (Bankr.W.D.N.Y.2000); *In re Sigrist,* 163 B.R. 940, 942 (Bankr.W.D.N.Y. 1994). Nor does the plaintiff claim a presumption of nondischargeability, such as would arise under the luxury goods provisions of subdivision (C) of section 523(a)(2), for certain consumer debts arising within sixty days of the order for relief. Rather, the complaint focuses only upon an alleged misrepresentation of intent to pay.

■ In *In re Lokotnicki,* 232 B.R. 583 (1999), this court held that the Supreme Court's decision in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) compels the application of a five part test

for actual fraud.[4] Specifically, this test requires that a creditor prove: (1) that the debtor made a false representation; (2) that the debtor knew the representation to be false; (3) that in making the representation, the debtor intended to deceive the creditor; (4) that the creditor justifiably relied upon the representation; and (5) that the debtor's representation caused the creditor to suffer damage or loss. In the view of this court, the plaintiff is unable to satisfy either the first, fourth, or fifth of these requirements.

### A. The debtor has made no false representation.

■ To find that a debtor has made a representation that is false, one must first identify the representation that the debtor has made. In its complaint, the Bank of America alleges only one false representation, namely a representation to be implied from the use of the credit card, relative to an intent to pay. While this notion of an implied representation might have some credence in the context of highly personalized transactions between a buyer and seller, no such statement is to be inferred from transactions involving multi-use credit cards.

Credit cards are of at least two types. The first are single-purpose cards. These are issued by a particular merchant to finance the purchase of goods or services from that merchant. For example, a department store may issue a credit card for use only in its own chain. Because it is the merchant who extends credit, a single agreement between the card issuer and card user will define the entire transaction. The present dispute involves the second type of credit card, namely a multi-purpose bank card. Its use may implicate as many as three agreements: the credit agreement between card issuer and card user; an agreement between merchant and the issuer of the credit card relative to the merchant's acceptance of the credit card as a device for payment; and the agreement between merchant and card user for the purchase of goods or services. While a single use card is like a line of credit with the issuer, the multi-purpose bank card is in the nature of a revocable letter of credit, to be used with many merchants as well as the issuer itself with respect to cash advances.

We need not today decide what implied representations arise from the use of a single-purpose credit card. With its utility limited to transactions between issuer and customer, such cards may arguably incorporate some of the representations that a traditional buyer extends to a seller of goods or services. *See In re Shanahan,* 151 B.R. 44 (Bankr.W.D.N.Y.1993). Rather, in the instant matter, this court must discern the representations made by the user of a multipurpose bank card. Explicitly, its use acknowledges liability for a debt and a promise of repayment. For example, upon his purchase of a snow plow, the debtor signed the statement in which he "acknowledges receipt of goods and/or services in the amount of the Total [sic] shown hereon and agrees to perform the obligations set forth in the Cardholder's agreement with the issuer." The

---

4. The Seventh Circuit has recently questioned the scope of this standard's application. In a decision by Chief Judge Posner, it held that fraud "is not limited to misrepresentations and misleading omissions," but " 'is a generic term, which embraces all the multifarious means which human ingenuity can devise.' " *McClellan v. Cantrell,* 217 F.3d 890, 893 (2000), *quoting Stapleton v. Holt,* 207 Okla. 443, 250 P.2d, 451, 453–54 (1952). Although I disagree with the Seventh Circuit's position, it is not necessary in the present instance to reexamine this issue. *McClellan* involved no allegation of any false representation. Thus, Judge Posner had need to distinguish cases like *Field v. Mans,* "in which the only fraud charged was misrepresentation." 217 F.3d at 892. In contrast, the Bank of America bases its complaint entirely upon an implied representation of intent. Accordingly, the instant case must necessarily implicate the occurrence of a representation upon which the creditor relied justifiably. Consistent with this approach the plaintiff has itself argued the five part test for fraud.

truthfulness of this acknowledgment, however, is not presently controverted: Jarczyk did receive the merchandise and he did accept certain terms of repayment. The Bank of America argues further, however, that from the debtor's acknowledgment of liability, one may infer an implicit representation of intent to pay. This court cannot agree.

"An inference is a factual conclusion that can rationally be drawn from other facts." [5] In *In re Contella,* this court considered the parameters of an allowable inference.

> For an inference to arise, there must exist some basis to conclude that the occurrence of fact "A" indicates and supports the occurrence of fact "B". That basis necessarily derives from the rules of probability. Based on the realm of human experience, does the presence of a particular fact make a second fact more probable than not?

166 B.R. 26, 29–30 (Bankr.W.D.N.Y.1994). In the view of this court, the use of a credit card suggests only a representation that the user possesses good credit sufficient to allow either the advance of funds or the purchase of goods or services. The fact of usage really says nothing about the user's intent either to pay or not to pay. Rather, it is at least equally probable that the use entails no expression of any intent at all. With no clear probability of any representation, this court is unwilling to infer any statement of intent to pay.

Being in the nature of a letter of credit, a multi-purpose bank card substitutes the credit of the issuer for that of the borrower. As with traditional letters of credit, insolvency is a risk that the bank has assumed, presumably after taking account of all risks of change in a customer's ability to pay. In his treatise on commercial letters of credit, Herman Finkelstein described this fundamental characteristic of such instruments.

> The very purpose for which the seller desires the letter of credit is to protect him against any vicissitudes of fortune which may occur to the buyer, and to relieve him from assuming the risk of the buyer's integrity. The bank, in issuing its letter of credit, takes upon itself these risks.

HERMAN N. FINKELSTEIN, LEGAL ASPECTS OF COMMERCIAL LETTERS OF CREDIT 251–52 (1930); *accord* JOHN F. DOLAN, THE LAW OF LETTERS OF CREDIT ¶ 2.02[1] (1999). Similarly, a multi-purpose bank card becomes the object of a merchant's reliance. This reliance then becomes the subject of the consumer's representation, namely that he or she possesses credit sufficient to assure payment to that merchant. As noted above, the typical transaction with a multi-purpose bank card involves three agreements. At the moment of card usage, the attention of the card holder is focused upon the agreement that he or she is completing at that moment, namely the agreement of purchase. Thus, the proper inference is a representation directed to the merchant. Representations about intent or ability to reimburse the bank would have been made, if at all, at the time of application for the credit card. Here, Jarczyk made no such application, but was invited to accept a credit offer that the Bank of America initiated. Consistent with these facts, the bank does not allege any misrepresentations by Jarczyk at the time of card issuance. At the moment of card usage, Jarczyk merely relied upon his outstanding credit, and gave no further representation to the plaintiff about any intent to pay.

To infer a representation of intent as of the moment of card usage would give honor to a fiction. I agree, therefore, with the recent decision of Judge Barbara Houser in *In re Kuntz,* 249 B.R. 699, 705 (Bankr. N.D.Tex.2000):

> The courts adopting the implied representation theory are creating a fictional representation because the card-holder's breach of contract when he fails to pay his credit card debt is insufficient as a

---

5. CLIFFORD S. FISHMAN, JONES ON EVIDENCE, CIVIL AND CRIMINAL § 4:1, at 299 (7th ed.1992).

matter of law to support a non-dischargeability complaint. If Congress intended to make breach of contract a basis for a nondischargeability complaint, the Code should be amended to so provide. Courts should not create a fictional representation flowing from use of the credit card to enable credit card companies to pursue debtors who otherwise made no express misrepresentations to them.

In the view of this court, the written acknowledgment on the charge receipt adds nothing to the representations that the card user makes to his or her lender. Rather, it merely confirms that the debtor has received goods or services, and that he or she wishes to finance a purchase through use of a credit card. Payment arrangements are the subject of the credit card agreement, and it is to the time of that agreement that one must look for any representations about intent to pay.

Some of Jarczyk's indebtedness was for cash advances that the Bank of America extended directly to the debtor. Even in that regard, Jarczyk's more probable representation was that he enjoyed an extant authorization to take cash. Here again, we may not infer any conclusion about intent. Representations about intent to pay were made, if at all, upon the opening of the credit card account, and not on the occasion of the card's use.

This court will therefore follow the line of decisions that have held that the use of a multi-purpose bank credit card entails no representation of an implied intent to repay. As noted by Judge Duhe in *In re Mercer*, the implied representation theory "would improperly shift the burden of proof in Section 523(a)(2)(A) actions." 211 F.3d at 217. Essentially making the debtor a "guarantor of his or her financial condition, ... the theory would offend 'the balance of bankruptcy policy struck by Section 523.'" 211 F.3d at 218, *quoting Chevy Chase Bank v. Briese*, 196 B.R. 440, 448 (Bankr.W.D.Wis.1996).

Even if one were to tergiversate the notions of risk assumption and that multi-purpose bank cards function like letters of credit, we must reject the plaintiff's suggested inference of intent to pay for a second reason. The scope of inferred representation can be no greater than what the parties have themselves defined as a standard for their relationship. Simply stated, the plaintiff has itself adopted a standard of good credit based not on the prospect of full repayment, but on its receipt of minimum monthly payments which in themselves provide no realistic means for any short term satisfaction of indebtedness. In its response to interrogatories, plaintiff indicated that in determining creditworthiness, it relied upon the Fair Isaac Score, if applicable. As stated by Judge Barksdale in his dissent in *Mercer*, 211 F.3d at 228, this score is a model "which predicts the probability of an account being delinquent for 60–90 days or more within a one-year period." More importantly, upon issuing its card, the Bank of America chose to continue a standard that requires not an ability or intent to repay, but an ability or intent to make a minimum monthly payment. Plaintiff argues that the debtor's borrowing practices may indicate an intent never to repay. But credit policies permitting such practices are equally indicative of a standard that ignores the ability to effect repayment. In paragraphs 15 and 16 of his own affidavit in opposition to Jarczyk's motion for summary judgment, counsel for Bank of America implicitly acknowledged this standard:

> Sometimes a Debtor will even take cash advances from a creditor, deposit those funds into his or her own checking account, and then make a payment to that *same* creditor with essentially the creditor's own money.... In so doing, Debtors can maintain a good credit rating and keep their accounts in good standing, which enables Debtors to continue using available credit on each of their existing accounts.

If minimal payments from borrowed sources can satisfy the plaintiff's standard for good credit, then such is the parameter of what a debtor represents about his or her good credit at the time of each use of a credit card. A borrowing to make a minimum monthly payment, however, does not truly constitute a payment at all. Rather, it represents only a churning of paper notations. But these are the standards that the Bank of America has itself adopted for creditworthiness. To the extent that Jarczyk's use of the credit card entailed any representation of creditworthiness, therefore, that representation would not encompass an indication of his intent or ability to repay.

This court does not suggest that the Bank of America ever promoted the use of cash advances to make a minimum monthly payment on either its own or another credit card.[6] The fact that such practices are consistent with good credit, however, is proof of a standard that disregards the goal of prompt repayment of all indebtedness, and substitutes for it the notion of an ongoing maintenance of debt. Such minimalism will maximize a lender's profit, but provides no meaningful mechanism for the obligation's discharge. In essence, borrowers are allowed to become indentured for the debt balances that are carried over from month to month. Under these circumstances, borrowers represent not an intent to pay, but merely their agreement to be bound.

During oral argument, plaintiff's counsel asked rhetorically why any lender would extend credit if it did not expect to be repaid. The answer lies in a desire for the profit that accrues when minimal monthly payments generate a sufficient recovery of interest to create income in excess of insolvency losses. It is not for this court, but for banks, to evaluate risk in the context of prevailing interest rates. When credit card issuers charge interest at rates that are a lucrative multiple of the rate that the issuer must pay as its cost of funds, resulting profits may prompt the wholesale marketing of credit, without regard for traditional sensibilities of thrift. This court need not consider whether current lending practices promote the best interests of our society. Rather, the court must apply the law to the facts that the parties have created for themselves. If lenders wish to set standards of creditworthiness that look only to the short term payment of minimum balances and not to the likelihood of prompt repayment of what truly should be in the nature of short term obligations, then those lenders may not imply a more demanding expectation of intent or ability to pay.

*B. The Plaintiff did not justifiably rely upon any representation of intent or ability to pay.*

In *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court ruled that a debt becomes non-dischargeable under 11 U.S.C. § 523(a)(2)(A) only when a creditor has justifiably relied upon a debtor's representation. Even if Jarczyk represented to the Bank of America that he had the ability and intention to pay the balance owed on his credit card, the bank did not justifiably rely upon that representation.

In its complaint, the Bank of America alleges that the debtor's income was stable for the two years prior to his bankruptcy filing, and that at the time of bankruptcy

---

6. Credit card issuers are bombarding Americans with invitations to transfer credit card account balances, or, in effect, to use new credit to discharge interest as well as principal obligations to other lenders. Some lenders allow consumers to skip a monthly payment, thereby effecting a sanctioned method for negative amortization of the loan. This court has no evidence of such practices by the plaintiff, and accordingly will not infer from them any standard of creditworthiness for purposes of the present case. Nonetheless, such practices are fully consistent with a conclusion that the credit card industry has abandoned traditional notions of debt repayment, and instead views the use of a credit card as nothing more than an acceptance of terms for a repayment that the debtor may or may not intend to make.

filing, the debtor had no disposable income from which to pay even the minimum monthly payments on his unsecured debt. As on the motion of any defendant for summary judgment, this court must accept these allegations as true. Thus, both on the date of his bankruptcy petition in May of 1998 and throughout all of 1997, Jarczyk had no disposable income in excess of his ordinary expenses. Without benefit of any financial statement or representation from Jarczyk, the Bank of America issued a credit card to the debtor in October of 1997. By month's end, he had used the card to purchase more than $4,000 of goods. By January of 1998, he had increased his account balance to $7,361.20. If the Bank of America deemed Jarczyk to be creditworthy at the beginning of October, then the same standard of creditworthiness would have applied when he used his card at the end of October. At both times, he had no disposable income. With no disposable income, Jarczyk had no ability to pay and any expression of an intent to pay would be meaningless. To the extent that the bank deemed ability and intent to pay to be irrelevant when it issued the credit card, such factors were similarly of no relevance on the occasion of its use. Having authorized credit without reliance on any representation of ability or intent to pay, the Bank of America may not later claim reliance upon such representations when that authorization was later utilized. In short, the bank's conduct belies any reliance, justifiable or otherwise, upon any representation from the defendant about his intent or ability to repay.

This case does not present the story of an innocent banker who has relied upon the representations of a scheming and devious borrower. By its own admission in answers to interrogatories, the Bank of America concedes that it established the debtor's creditworthiness through use of a matrix approach. Today, much of the credit card industry defines risk not in reliance upon representations, but by sophisticated statistical models. For the Bank of America, such models have so

accurately defined risk that the plaintiff chose not to inquire from Jarczyk about his ability to pay. If the bank cares not about whether prospective customers are living beyond their means, then it may not later claim reliance upon an intent that would otherwise be unfounded without that ability to pay. In making its credit decisions, therefore, the plaintiff simply placed its reliance upon considerations other than whatever representation the borrower might make at the time of credit card use.

■ Even if the plaintiff had relied upon some actual representation at the time of card issuance, the character of a credit card transaction precludes reliance upon any implied representation at the time of card use. The primary decision to extend credit is made upon the card issuance, before any implied representation. *In re Mercer*, 211 F.3d at 217. Accordingly, the lender's reliance relates to representations during the application process (if any), and not to any subsequent expression of intent. This court agrees with the analysis of Judge Houser:

> A party extending credit under a contract relies upon the other's express promise to pay contained in that contract, not a later implied representation of intent to pay flowing from performance.... With [the card issuer] in possession of [an express promise to pay], it would be illogical to conclude that [the card issuer] relied upon a later implied representation of intent to pay emanating from Debtor's use of the Credit Card. Use of the card did not create a separate contract. Debtor was merely exercising her rights under the credit agreement.

*In re Kuntz*, 249 B.R. at 707–08.

C. *The cause of plaintiff's loss was other than any representation by the defendant.*

■ What caused the plaintiff's loss was not its reliance upon any representation of intent or ability to repay, but the dangers that were attendant to its lending practices. Mark E. Jarczyk was but one cus-

tomer in a portfolio of unsecured loans carrying rates of interest that were sufficiently high to accommodate their special potential of risk. For the sake of his own financial well-being, Jarczyk should have viewed his credit card obligation as a short term commitment. Instead, its minimum monthly payments allowed for no rapid amortization of principal. Indeed, the bank would maximize its profitability if Jarczyk would treat his debt like a long term obligation. Accordingly, the bank's best customers become those who maintain an unpaid balance upon which they must continue to pay interest. Consistent with this fact, the standard of good credit is not whether the balance has been promptly repaid, but whether the borrower is able to make the monthly minimum payment. In establishing its relationship with the debtor, the Bank of America offered easy access to credit without a credit application. In return, the bank established an account with yet another customer who would treat his credit card like cash. Under these circumstances, the cause of the bank's loss became identical to the source of its profit, namely unmanaged debt that the bank allowed Jarczyk to create despite the absence of any sound financial plan or purpose. Surely, the bank is at liberty to extend credit liberally to anyone it may choose. When it does so, however, it must appreciate the true cause of any default, and not attach blame to some imagined representation upon which the lender never truly relied.

*Plaintiff enjoys no greater claim under theories of false pretense and false representation.*

■ Plaintiff's complaint seeks to avoid the discharge of a debt for money, property or services obtained by "false pretenses, a false representation, or actual fraud." Thus far, this opinion has considered only the requirements for proof of actual fraud. However, actual fraud is essentially the same cause of action as either false pretenses or false representation. In *Field v. Mans,* the Supreme Court "relied on the RESTATEMENT (SECOND) OF TORTS (1976), which did not differentiate between false pretenses, misrepresentations, and actual fraud." *In re Mercer,* 211 F.3d at 224 (dissenting opinion). At this time, we need not now identify any subtle distinctions among these bases for relief. It suffices to note that each would require the occurrence of some representation that is false, as well as a showing of justifiable reliance and causation of loss. Unable to demonstrate these elements of actual fraud, the plaintiff similarly lacks a cause of action for false pretenses and false representation.

■ *Entitlement to Summary Judgment:* The Bank of America argues that summary judgment is premature, in that discovery is not yet complete. In particular, the plaintiff wishes to inquire from Jarczyk about his knowledge and intent, and to explore the existence of any "red flags" that might have alerted the plaintiff to the need for further investigation. None of the proposed discovery, however, relates to the elements of proof that are the basis for the court's decision. The occurrence of a representation and the fact of a lender's reliance are factors external to any knowledge or intent of the borrower. Inquiries about the debtor's knowledge and intent become relevant only if the plaintiff is able to show the existence of a false representation upon which it has justifiably relied. "Red flags" may dissipate the justification for a lender's reliance, and will have relevance to those instances in which a lender can otherwise demonstrate its reliance on a representation. For the reasons stated above, with or without any "red flags", the Bank of America had no justification for a reliance upon any implied representation of intent.

The outstanding factual disputes simply present no material issue that might impact the outcome of this case. Thus, this court sees no need for further discovery. With its approach to the extension of credit in the present instance, the Bank of America is unable to show either the making of a false representation, or that it relied upon any such representation, or

that any such representation was cause for financial loss. For these three independent reasons, the plaintiff must fail in its proof of the necessary elements of its cause of action.

This court does not condone irresponsible borrowing, *see In re Wolniewicz,* 224 B.R. 302 (Bankr.W.D.N.Y.1998), but neither will it condone irresponsible lending. When both lender and borrower are oblivious to sound notions of personal financial management, each has met its match and must suffer the resulting consequences. For the debtor, these consequences include a stigma that will be as ignominious as lenders may properly wish to ordain. For the lender, these consequences include a discharge of all but a very limited class of obligations. Unless a creditor can precisely satisfy one of the exceptions in 11 U.S.C. § 523(a), bankruptcy will effect a discharge of the indebtedness. Unable to show either a false pretense, or a false representation, or actual fraud, the Bank of America must fail in its claim of nondischargeability.

For all of the reasons stated herein, the defendant's motion for summary judgment is granted.

So ordered.